## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CRYSTAL CARTER, SUSAN CIFELLI, and LETITIA TAYLOR, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>DISCOVERY COMMUNICATIONS, LLC,<br><br>Defendant. | **Case No.**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Crystal Carter, Susan Cifelli, and Letitia Taylor ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by and through their attorneys, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      This is a class action suit brought on behalf of all persons with Facebook accounts who watch videos on hgtv.com and subscribe to HGTV's newsletter.

2.      Discovery Communications, LLC ("Defendant" or "HGTV") develops, owns, and operates hgtv.com, a website that hosts and delivers hundreds of videos[1] featuring "home and lifestyle content."[2]  The website's content is popular among viewers, "attract[ing] an average of 9.9 million people each month."[3]

---

[1] HGTV, Videos, https://www.hgtv.com/videos.
[2] Discovery, HGTV Series 'Good Bones' Delivers Strong Season Performances in Key Demos, https://press.discovery.com/us/hgtv/press-releases/2021/hgtv-series-good-bones-delivers-strong-season-5558/.
[3] *Id.*

3.      Defendant monetizes its website by knowingly collecting and disclosing its subscribers' personally identifiable information—including a record of every video clip they view—to Facebook without consent.

4.      The United States Congress passed the Video Privacy Protection Act ("VPPA") in 1988, seeking to confer onto consumers the power to "maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers." S. Rep. No. 100-599, at 8. "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent." *Id.*

5.      Defendant violated the VPPA by knowingly transmitting Plaintiffs' and the putative class's personally identifiable information to unrelated third parties.

## FACTUAL BACKGROUND

**I.      The VPPA**

6.      The origins of the VPPA begin with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court. During the confirmation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper, who then published that history. Congress responded by passing the VPPA, with an eye toward the digital future. As Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home. In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone. I think that is wrong.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

7.      The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider."  18 U.S.C. § 2710(b)(1).  The VPPA defines personally identifiable information as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider."  18 U.S.C. § 2710(a)(3).  A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials."  18 U.S.C. § 2710(a)(4).

## II.    The Facebook Tracking Pixel

8.      Facebook is the largest social networking site on the planet, touting 2.9 billion monthly active users.[4]  Facebook describes itself as a "real identity platform,"[5] meaning users are allowed only one account and must share "the name they go by in everyday life."[6]  To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[7]

9.      Facebook generates revenue by selling advertising space on its website.[8]

---

[4] Sean Burch, *Facebook Climbs to 2.9 Billion Users, Report 29.1 Billion in Q2 Sales*, YAHOO (July 28, 2021), https://www.yahoo.com/now/facebook-climbs-2-9-billion-202044267.html
[5] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).
[6] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.
[7] FACEBOOK, SIGN UP, https://www.facebook.com/
[8] Mike Isaac, *Facebook's profit surges 101 percent on strong ad sales.*, N.Y. TIMES (July 28, 2021), https://www.nytimes.com/2021/07/28/business/facebook-q2-earnings.html.

10.     Facebook sells advertising space by highlighting its ability to target users.[9] Facebook can target users so effectively because it surveils user activity both on and off its site.[10] This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[11]  Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[12]

11.     Advertisers can also build "Custom Audiences."[13]  Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[14] Advertisers can use a Custom Audience to target existing customers directly, or they can use it to build a "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[15]   Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Facebook.  They can do so through two mechanisms: by manually uploading contact information

---

[9] FACEBOOK, WHY ADVERTISE ON FACEBOOK,
https://www.facebook.com/business/help/205029060038706.
[10] FACEBOOK, ABOUT FACEBOOK PIXEL,
https://www.facebook.com/business/help/742478679120153?id=1205376682832142.
[11] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS,
https://www.facebook.com/business/ads/ad-targeting.
[12] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK,
https://www.facebook.com/business/news/Core-Audiences.
[13] FACEBOOK, ABOUT CUSTOM AUDIENCES,
https://www.facebook.com/business/help/744354708981227?id=2469097953376494.
[14] FACEBOOK, ABOUT EVENTS CUSTOM AUDIENCE,
https://www.facebook.com/business/help/366151833804507?id=300360584271273.
[15] FACEBOOK, ABOUT LOOKALIKE AUDIENCES,
https://www.facebook.com/business/help/164749007013531?id=401668390442328.

for customers, or by utilizing Facebook's "Business Tools," which collect and transmit the data automatically.[16] One such Business Tool is the Facebook Tracking Pixel.

12.     The Facebook Tracking Pixel is a piece of code that advertisers, like Defendant, can integrate into their website.  Once activated, the Facebook Tracking Pixel "tracks the people and type of actions they take."[17]  When the Facebook Tracking Pixel captures an action, it sends a record to Facebook.  Once this record is received, Facebook processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

13.     Advertisers control what actions—or, as Facebook calls it, "events"—the Facebook Tracking Pixel will collect, including the website's metadata, along with what pages a visitor views.[18]  Advertisers can also configure the Facebook Tracking Pixel to track other events.  Facebook offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[19]  An advertiser can also create their own tracking parameters by building a "custom event."[20]

14.     Advertisers control how the Facebook Tracking Pixel identifies visitors.  The Facebook Tracking Pixel is configured to automatically collect "HTTP Headers" and "Pixel-

---

[16] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.
[17] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.
[18] See FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; see also FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142.
[19] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.
[20] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142.

specific Data."[21]  HTTP Headers collect "IP addresses, information about the web browser, page location, document, referrer and persons using the website."[22]  Pixel-specific Data includes "the Pixel ID and cookie."[23]

## II.   HGTV And The Facebook Pixel

15.   HGTV's website hosts and delivers hundreds of videos.

16.   HGTV hosts the Facebook Tracking Pixel and transmits nine distinct events to Facebook:[24]

**Figure 1**



17.   Each metric independently and jointly permits an ordinary person to identify a video and the video's content.

//

---

[21] FACEBOOK, FACEBOOK PIXEL, https://developers.facebook.com/docs/facebook-pixel/.
[22] *Id.*
[23] *Id.*
[24] This data derives from a tool created and offered by Facebook.

18.   PageView discloses a video's URL whenever a viewer accesses that webpage.

**Figure 2**



19.   ViewContent likewise discloses that video's URL.

**Figure 3**



20. Microdata and Button Click also discloses the video's title.

**Figures 4 & 5**




21. VideoAdStart and VideoAdComplete discloses when a viewer starts and finishes the advertisement that plays before the video.

**Figures 6 & 7**

22.     VideoContentStart and VideoContentComplete register and disclose when a viewer starts and finishes the video's content.

**Figures 8 & 9**




23.     All eight events, independently and jointly, permit an ordinary person to identify a video's content, title, and URL.

24.     When a visitor watches a video on hgtv.com while logged into Facebook, HGTV compels a visitor's browser to transmit the c_user cookie to Facebook.  The c_user cookie contains that visitor's unencrypted Facebook ID.  When accessing the above video, for example, HGTV compelled the browser to send eight cookies:

**Figure 10**

| _fbp | fb.1.1644592641507.769220236 | .discovery.com |
|------|------------------------------|----------------|
| presence | C%7B%22t3%22%3A%5B%5D%2C%22... | .facebook.com |
| fr | 0OZjGEECmqGGyLX4q.AWWS6bg5U3z... | .facebook.com |
| c_user | 100035966074568 | .facebook.com |
| wd | 1747x919 | .facebook.com |
| locale | en_US | .facebook.com |
| xs | 7%3AZn79lq-2KaPyJA%3A2%3A16445... | .facebook.com |
| sb | yGMFYtV4z44zEb3_8UoPxsq_ | .facebook.com |
| datr | Z2YFYqT1CvDcC_Zu5ppSHaRo | .facebook.com |

25.     When a visitor's browser has recently logged out of Facebook,  HGTV will compel the browser to send a smaller set of cookies:[25]

**Figure 11**

| datr | Z2YFYqT1CvDcC_Zu5ppSHaRo | .facebook.com |
|------|--------------------------|---------------|
| sb | yGMFYtV4z44zEb3_8UoPxsq_ | .facebook.com |
| locale | en_US | .facebook.com |
| fr | 0OZjGEECmqGGyLX4q.AWVR7Q63weH.... | .facebook.com |
| wd | 1747x919 | .facebook.com |

26.     The fr cookie contains, at least, an encrypted Facebook ID and browser identifier.[26]  The _fbp cookie contains, at least, an unencrypted value that uniquely identifies a browser.[27]  The datr cookies also identifies a browser.[28]  Facebook, at a minimum, uses the fr and _fbp cookies to identify users.[29]

27.     If a visitor has never created a Facebook account, HGTV transmits three cookies, two of which are visible here:[30]

**Figure 12**

| sb | S48GYpes1GNR9zkzJVS6oDjh | .facebook.com |
|----|--------------------------|---------------|
| fr | 0WoVEtgXPGEsAkCv2..BiBo9J.tS.AAA.0.... | .facebook.com |

28.     Without a corresponding Facebook ID, the fr cookie contains, at least, an abbreviated and encrypted value that identifies the browser.  The _fbp cookie contains, at least,

---

[25] The _fbp cookie, visible in Figure 10, is not shown here but is still transmitted.

[26] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012),  http://www.europe-v-facebook.org/ODPC_Review.pdf.

[27] FACEBOOK, CONVERSION API, https://developers.facebook.com/docs/marketing-api/conversions-api/parameters/fbp-and-fbc/.

[28] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[29] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[30] The _fbp cookie, visible in Figure 10, is not shown here but is still transmitted.

an unencrypted value that uniquely identifies a browser.  Facebook uses both for targeted advertising.

29.      The fr cookie will expire after 90 days unless the visitor's browser logs back into Facebook.[31]  If that happens, the time resets, and another 90 days begins to accrue.[32]

30.      The _fbp cookie will expire after 90 days unless the visitor's browser accesses the same website.[33]  If that happens, the time resets, and another 90 days begins to accrue.[34]

31.      The Facebook Tracking Pixel uses both first- and third-party cookies.  A first-party cookie is "created by the website the user is visiting"—*i.e.*, HGTV.[35]  A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook.[36]  The _fbp cookie is always transmitted as a first-party cookie.  A duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook.

32.      Facebook, at a minimum, uses the fr, _fbp, and c_user cookies to link to Facebook IDs and corresponding Facebook profiles.

33.      A Facebook ID is personally identifiable information.  Anyone can identify a Facebook profile—and all personal information publicly listed on that profile—by appending the Facebook ID to the end of Facebook.com.

---

[31] *See* FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.
[32] Confirmable through developer tools.
[33] *See* FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.
[34] Also confirmable through developer tools.
[35] PC MAG, FIRST-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/first-party-cookie.  This is confirmable by using developer tools to inspect a website's cookies and track network activity.
[36] PC MAG, THIRD-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/third-party-cookie.  This is also confirmable by tracking network activity.

34.     Through the Facebook Tracking Pixel's code, these cookies combine the identifiers with the event data, allowing Facebook to know, among other things, what HGTV videos a user has watched.[37]

35.     HGTV also uses "Automatic Advanced Matching."  When activated, the Facebook Tracking Pixel "look[s] for recognizable form field and other sources on your website that contain information such as first name, last name and email."[38]  The Facebook Tracking Pixel's code collect[s] that information, "along with the event, or action, that took place."[39]  This information is "hashed,"[40] meaning it is "[a] computed summary of digital data that is a one-way process."[41]  In other words, it "cannot be reversed back into the original data."[42]

36.     HGTV discloses this information so it can better match visitors to their Facebook profiles, which thereby allows HGTV to better track analytics and target its advertisements:

**Figure 13**



You can use Advanced Matching to help:

- Increase the number of attributed conversions. We can match more of the conversions that happen on your website to people on Meta. This helps you understand the impact of your ads on website conversions.

- Increase your Custom Audience size. We're able to better match your website visitors to people on Meta and increase the size of your Custom Audience.

- Decrease the cost per conversion. Conversion-optimized campaigns become more efficient because we can better identify and deliver ads to the types of people likely to take the actions you care about.

---

[37] FACEBOOK, GET STARTED, https://developers.facebook.com/docs/meta-pixel/get-started.
[38] https://www.facebook.com/business/help/611774685654668?id=1205376682832142
[39] FACEBOOK, ABOUT ADVANCED MATCHING FOR WEB,
https://www.facebook.com/business/help/611774685654668?id=1205376682832142.
[40] DEFINITION OF HASH, https://www.pcmag.com/encyclopedia/term/hash
[41] *Id.*
[42]   *Id.*

37.     HGTV's Facebook Tracking Pixel is configured to scan form fields containing a

user's email, first name, last name, gender, phone number, city, state, and zip code:[43]

**Figure 14**



38.     Every individual who subscribes to HGTV's newsletter must input an email

address.

**Figure 15**

39.     HGTV discloses a subscriber's email address whenever they input it into the form

field.

40.     HGTV knows Facebook will match the Advanced Matching parameters with a

subscriber's subsequent activity, thereby helping HGTV "[i]ncrease the number of attributed

---

[43] Facebook provides a corresponding look-up table: FACEBOOK, ADVANCED MATCHING,
https://developers.facebook.com/docs/meta-pixel/advanced/advanced-matching.

conversions," "[i]ncrease [its] Custom Audience size," and "[d]ecrease the cost per conversion."[44]

41.     HGTV also discloses to Facebook that an individual has subscribed to the newsletter in the first place.

**Figure 16**



//

//

//

//

//

//

---

[44] FACEBOOK, ABOUT ADVANCED MATCHING FOR WEB,
https://www.facebook.com/business/help/611774685654668?id=1205376682832142.

42.    After providing their email address, subscribers must select each newsletter they'd like to receive.

**Figure 16**



43.    The principal purpose of the newsletter is to drive traffic to HGTV's website. The overwhelming amount of content featured in the newsletter links back to articles and videos on hgtv.com.

**Figure 17**



44.     By subscribing to HGTV's newsletter, Plaintiffs subscribed to "goods or services from a video tape service provider."  18 U.S.C. § 2710.

45.     By compelling a visitor's browser to disclose the Advanced Matching parameters alongside event data for videos, HGTV knowingly discloses information sufficiently permitting an ordinary person to identify a specific individual's video viewing behavior.

46.     By compelling a visitor's browser to disclose the c_user cookie alongside event data for videos, HGTV knowingly discloses information sufficiently permitting an ordinary person to identify a specific individual's video viewing behavior.

47.     By compelling a visitor's browser to disclose the fr and _fbp cookies alongside event data for videos, HGTV discloses information sufficiently permitting an ordinary person to identify a specific individual's video viewing behavior.

48.     By compelling a visitor's browser to disclose the fr cookie and other browser identifiers alongside event data for videos, HGTV discloses information sufficiently permitting an ordinary person to identify a specific individual's video viewing behavior.

//

//

//

//

//

//

//

//

49.     Facebook confirms that it matches activity on HGTV with a user's profile. Facebook allows users to download their "off-site activity," which is a "summary of activity that businesses and organizations share with us about your interactions, such as visiting their apps or websites."[45]  Here, the off-site activity report confirms HGTV identifies an individual's video viewing activities:

**Figure 18**



| Activity received from hgtv.com | |
|---|---|
| ID | 665960526897455 |
| Event | PAGE_VIEW |
| Received on | January 14, 2022 at 10:46 AM |

50.     The "ID" shown here is the same Facebook Pixel ID visible in the first image. The Facebook Pixel ID is a numerical code that uniquely identifies each Pixel.[46]  In practice, this means HGTV's Facebook Tracking Pixel has a Pixel ID that differs from all other websites.  All subscribers who view videos on hgtv.com can pull their off-site activity report and see the same Pixel ID.

**III.     Experience of Plaintiff Crystal Carter**

51.     In 2010, Plaintiff Carter created a Facebook account.

52.     From 2018 to February 2022, Plaintiff Carter enrolled in Defendant's newsletter. During that same time period, Plaintiff Carter watched videos on hgtv.com.  Defendant disclosed

---

[45] FACEBOOK, WHAT IS OFF-FACEBOOK ACTIVITY?, https://www.facebook.com/help/2207256696182627.  As discussed there, the Off-Facebook Activity is only a "summary" and Facebook acknowledges "receiv[ing] more details and activity than what appears in your Facebook activity."  What is more, it omits "information we've received when you're not logged into Facebook, or when we can't confirm that you've previously used Facebook on that device."
[46] FACEBOOK, GET STARTED, https://developers.facebook.com/docs/meta-pixel/get-started.

her event data, which recorded and disclosed the video's title and content, along with every time Plaintiff Carter paused a video, played a video, started a video, or completed a video.

53.     When Plaintiff Carter first subscribed, she entered her email address.  Defendant then disclosed this identifier to Facebook, along with her Facebook ID and other identifying information, like identifiers for her browser.

54.     When Plaintiff Carter watched videos on hgtv.com, Defendant disclosed event data to Facebook, knowing Facebook would combine that data with the identifiers.  By doing so, HGTV disclosed Plaintiff Carter's PII to a third-party.

55.     Plaintiff Carter discovered that HGTV surreptitiously collected and transmitted her personally identifiable information in February 2022.

**IV.     Experience of Plaintiff Susan Cifelli**

56.      In 2010, Plaintiff Cifelli created a Facebook account.

57.     In approximately 2010, Plaintiff Cifelli enrolled in Defendant's newsletter.   Since then, Plaintiff Cifelli has watched videos on hgtv.com.  Defendant disclosed her event data, which recorded and disclosed the video's title and content, along with every time Plaintiff Cifelli paused a video, played a video, started a video, or completed a video.

58.      When Plaintiff Cifelli first subscribed, she entered her email address.  Defendant then disclosed this identifier to Facebook, along with her Facebook ID and other identifying information, like identifiers for her browser.

59.     When Plaintiff Cifelli watched videos on hgtv.com, Defendant disclosed event data to Facebook, knowing Facebook would combine that data with the identifiers.  By doing so, HGTV disclosed Plaintiff Cifelli's PII to a third-party.

60.     Plaintiff Cifelli discovered that HGTV surreptitiously collected and transmitted her personally identifiable information in February 2022.

**V.     Experience of Plaintiff Letitia Taylor**

61.      In or around 2007, Plaintiff Taylor created a Facebook account.

62.     From approximately 2019 to 2021, Plaintiff Taylor enrolled in Defendant's newsletter.   During that same time period, Plaintiff Taylor watched videos on hgtv.com. Defendant disclosed her event data, which recorded and disclosed the video's title and content, along with every time Plaintiff Taylor paused a video, played a video, started a video, or completed a video.

63.     When Plaintiff Taylor first subscribed, she entered her email address.  Defendant then disclosed this identifier to Facebook, along with her Facebook ID and other identifying information, like identifiers for her browser.

64.     When Plaintiff Taylor watched videos on hgtv.com, Defendant disclosed event data to Facebook, knowing Facebook would combine that data with the identifiers.  By doing so, HGTV disclosed Plaintiff Taylor's PII to a third-party.

65.     Plaintiff Taylor discovered that HGTV surreptitiously collected and transmitted her personally identifiable information in February 2022.

## PARTIES

66.     Plaintiff Carter is, and has been at all relevant times, a resident of New York, New York and has an intent to remain there, and is therefore a domiciliary of New York.

67.     Plaintiff Cifelli is, and has been at all relevant times, a resident of Vernon, New Jersey and has an intent to remain there, and is therefore a domiciliary of New Jersey.

68.     Plaintiff Taylor is, and has been at all relevant times, a resident of Georgetown,

Delaware and has an intent to remain there, and is therefore a domiciliary of Delaware.

69.     Defendant Discovery Communications, LLC is a Delaware corporation with its principal place of business at 230 Park Avenue South New York, NY 10001.  Defendant develops, owns, and operates hgtv.com, which is used throughout New York and the United States.

## JURISDICTION AND VENUE

70.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the VPPA).

71.     This Court has personal jurisdiction over Defendant because Defendant's principal place of business is in New York, New York.

72.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## CLASS ALLEGATIONS

73.     **Class Definition:**  Plaintiffs seek to represent a class of similarly situated individuals defined as all persons in the United States who have a Facebook account, subscribed to HGTV's newsletter, and viewed videos on HGTV's website (the "Class").

74.     Subject to additional information obtained through further investigation and discovery, the above-described Class may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

75.     **Numerosity (Fed. R. Civ. P. 23(a)(1)):**  At this time, Plaintiffs do not know the exact number of members of the aforementioned Class.  However, given the popularity of Defendant's website, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

76.     **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3)):**  There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual members of the Class include:

> (a)  whether Defendant collected Plaintiffs' and the Class's PII;
>
> (b)  whether Defendant unlawfully disclosed and continues to disclose its users' PII in violation of the VPPA;
>
> (c)  whether Defendant's disclosures were committed knowingly; and
>
> (d)  whether Defendant disclosed Plaintiffs' and the Class's PII without consent.

77.     **Typicality (Fed. R. Civ. P. 23(a)(3)):**  Plaintiffs' claims are typical of those of the Class because Plaintiffs, like all members of the Class, used HGTV's website to watch videos, and had their PII collected and disclosed by Defendant.

78.     **Adequacy (Fed. R. Civ. P. 23(a)(4)):**  Plaintiffs have retained and are represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including litigation concerning the VPPA and its state-inspired offspring. Plaintiffs and their counsel are committed to vigorously prosecuting this class action.  Moreover, Plaintiffs are able to fairly and adequately represent and protect the interests of the Class. Neither Plaintiffs nor their counsel have any interest adverse to, or in conflict with, the interests of the absent members of the Class.  Plaintiffs have raised viable statutory claims or the type reasonably expected to be raised by members of the Class, and will vigorously pursue those claims.  If necessary, Plaintiffs may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Class, additional claims as may be appropriate, or to amend the definition of the Class to address any steps that Defendant took.

79.     **Superiority (Fed. R. Civ. P. 23(b)(3)):**  A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class is impracticable.  Even if every member of the Class could afford to pursue individual litigation, the court system could not.  It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.  Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.  By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Class.  Plaintiffs anticipate no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### COUNT I
**VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT**
**18 U.S.C. § 2710, *et seq.***

80.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

81.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendant.

82.     Defendant is a "video tape service provider" because it creates, hosts, and delivers hundreds of videos on its website, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).  In particular, Defendant solicits individuals to

subscribe to their newsletter that advertises and promotes videos and articles on its website, hgtv.com.

83.     Plaintiffs and members of the Class are "consumers" because they subscribed to HGTV's newsletter.  18 U.S.C. § 2710(a)(1).

84.     HGTV disclosed to a third party, Facebook, Plaintiffs' and the Class members' personally identifiable information.  HGTV utilized the Facebook Tracking Pixel to compel Plaintiffs' web browser to transfer Plaintiffs' identifying information, like their Facebook ID, along with Plaintiffs' event data, like the title of the videos they viewed.

85.     Plaintiffs and the Class members viewed video clips using HGTV's website.

86.     HGTV knowingly disclosed Plaintiffs' PII because it used that data to build audiences on Facebook and retarget them for its advertising campaigns.

87.     Plaintiffs and Class members did not provide Defendant with any form of consent—either written or otherwise—to disclose their PII to third parties.

88.     Nor were Defendant's disclosures made in the "ordinary course of business" as the term is defined by the VPPA.  In particular, HGTV's disclosures to Facebook were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership."  18 U.S.C. § 2710(a)(2).

89.     On behalf of themselves and the Class, Plaintiffs seeks: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the Class by requiring Defendant to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs seek a judgment against Defendant, individually and on behalf of all others similarly situated, as follows:

(a)  For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiffs as representatives of the Class, and naming Plaintiffs' attorneys as Class Counsel to represent the Class;

(b)  For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c)  For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

(d)  An award of statutory damages to the extent available;

(e)  For punitive damages, as warranted, in an amount to be determined at trial;

(f)  For prejudgment interest on all amounts awarded;

(g)  For injunctive relief as pleaded or as the Court may deem proper; and

(h)  For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit.

## **JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b)(1), Plaintiffs demand a trial by jury of all issues so triable.

Dated: March 11, 2022                    Respectfully submitted,

By: */s/ Joshua D. Arisohn*

**BURSOR & FISHER, P.A.**
Joshua D. Arisohn
Philip L. Fraietta
888 Seventh Avenue
New York, NY 10019
Tel: (646) 837-7150

Fax: (212) 989-9163
E-Mail: jarisohn@bursor.com
          pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Christopher R. Reilly*
701 Brickell Avenue, Suite 1420
Miami, FL 33131
Tel: (305) 330-5512
Fax: (305) 679-9006
E-Mail:  creilly@bursor.com

*Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiffs and the Putative Class*