**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CRYSTAL CARTER, SUSAN CIFELLI, and LETITIA TAYLOR, individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>     v.<br><br>SCRIPPS NETWORKS, LLC,<br><br>                    Defendant. | 1:22-cv-02031-PGG |

## MEMORANDUM OF LAW IN SUPPORT OF <u>DEFENDANT'S MOTION TO DISMISS THE COMPLAINT</u>

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

*Attorneys for Defendant Scripps Networks, LLC*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND .................................................................................................... 4

LEGAL STANDARD FOR MOTION TO DISMISS.................................................. 9

ARGUMENT ...................................................................................................... 10

I.     PLAINTIFFS FAIL TO STATE A CLAIM TO RELIEF UNDER THE VPPA ............. 10

     A.     HGTV.com's Newsletter is distinct and set apart from video content. ................ 10

     B.     Plaintiffs have not adequately alleged that Scripps disclosed PII.......................... 16

     C.     Plaintiffs have not sufficiently pleaded that Scripps "knowingly" disclosed PII................................................................................................................. 21

II.    PLAINTIFFS LACK ARTICLE III STANDING ......................................... 23

CONCLUSION................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)................................................................................9

*Austin-Spearman v. AMC Network Ent. LLC*,
    98 F. Supp. 3d 662 (S.D.N.Y. 2015)....................................................... *passim*

*Bernardino v. Barnes & Noble Booksellers, Inc.*,
    No. 17-CV-04570 (LAK) (KHP), 2017 WL 3727230 (S.D.N.Y. Aug. 11,
    2017), *report and recommendation adopted*, No. 17-CV-4570 (LAK), 2017
    WL 3726050 (S.D.N.Y. Aug. 28, 2017).........................................17, 22

*Boelter v. Hearst Commc'ns, Inc.*,
    192 F. Supp. 3d 427 (S.D.N.Y. 2016)....................................................14

*Ciccone v. Cavalry Portfolio Servs., LLC*,
    No. 21-cv-2428 (JS) (JMW), 2021 WL 5591725 (E.D.N.Y. Nov. 29, 2021) .................23, 24

*Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.á.r.l.*,
    790 F.3d 411 (2d Cir. 2015)....................................................................9

*Delta Air Lines, Inc. v. New York City Dep't of Consumer Affs.*,
    564 F. Supp. 3d 109 (E.D.N.Y. 2021) ...................................................16

*Ellis v. Cartoon Network, Inc.*,
    803 F.3d 1251 (11th Cir. 2015) ........................................................14, 15

*In re Enron Corp.*,
    379 B.R. 425 (S.D.N.Y. 2007)........................................................3, 7, 20

*Fernandez v. Zoni Language Ctrs., Inc.*,
    No. 15-cv-6066 (PKC), 2016 WL 2903274 (S.D.N.Y. May 18, 2016)................4, 5

*In re Hulu Priv. Litig.*,
    86 F. Supp. 3d 1090 (N.D. Cal. 2015) .............................................21, 22

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Lit.*,
    No. 14 MD 2452 (VSB) (SLC), 2022 WL 1082087 (S.D.N.Y. Apr. 11, 2022).....................17

*Leisure Vue, Inc. v. Comm'r of Tax'n & Fin.*,
    172 A.D.2d 872 (3d Dep't 1991)............................................................16

*In re Nickelodeon Consumer Priv. Litig.*,
    827 F.3d 262 (3d Cir. 2016)..............................................................13, 21

*In re Nickelodeon Consumer Priv. Litig.*,
   No. CIV.A. 12-07829, 2014 WL 3012873 (D.N.J. July 2, 2014)............................................6

*Orozco v. Fresh Direct, LLC*,
   No. 15-CV-8226 (VEC), 2016 WL 5416510 (S.D.N.Y. Sept. 27, 2016).........................4, 5, 8

*Perry v. Cable News Network, Inc.*,
   854 F.3d 1336 (11th Cir. 2017) ........................................................................................15

*In re PetroChina Co. Ltd. Sec. Litig.*,
   120 F. Supp. 3d 340 (S.D.N.Y. 2015), *aff'd* (2d Cir. Mar. 21, 2016)..........................7, 18, 19

*Robinson v. Disney Online*,
   152 F. Supp. 3d 176 (S.D.N.Y. 2015)................................................................18, 20, 22

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016)........................................................................................................25

*Sputz v. Alltran Fin., LP*,
   No. 21-CV-4663 (CS), 2021 WL 5772033 (S.D.N.Y. Dec. 5, 2021)....................................24

*TransUnion LLC v. Ramirez*,
   141 S. Ct. 2190 (2021)..........................................................................................3, 4, 10, 23

*United States v. Shultz*,
   No. 16-10107-01-EFM, 2018 WL 534333 (D. Kan. Jan. 24, 2018)......................................12

*Wilson v. Triller, Inc.*,
   No. 21-cv-11228 (JSR), 2022 WL 1138073 (S.D.N.Y. Apr. 18, 2022) ........................ *passim*

*Yershov v. Gannett Satellite Info. Network, Inc.*,
   820 F.3d 482 (1st Cir. 2016)...............................................................................................21

*Zevon v. Am. Express Co.*,
   No. 1:20-CV-4938-GHW, 2021 WL 4330578 (S.D.N.Y. Sept. 22, 2021)............................24

**Statutes**

18 U.S.C. § 2710................................................................................................... *passim*

Conn. Gen. Stat. Ann. § 53-450(a) .............................................................................13, 14

Del. Code Ann. tit. 11, § 925(a)........................................................................................13

Mich. Comp. Laws Ann. § 445.1711(a) .............................................................................14

N.Y. Gen. Bus. Law §§ 672, 673, 674...............................................................................13

N.Y. Tax Law § 208.11 ....................................................................................................15

N.Y. City Incorp. Bus. Tax § 2 ..................................................................................15, 16

**Other Authorities**

47 C.F.R. § 64.1200(f)(1) ...................................................................................16

S. REP. NO. 100-599 (1988) .................................................................1, 12, 13, 15

134 Cong. Rec. S5397-01 (1988) .......................................................................13

Fed. R. Civ. P. 12(b)(1) .........................................................................................1, 9

Fed. R. Civ. P. 12(b)(6) .........................................................................................1, 9

Black's Law Dictionary (11th ed. 2019) ..............................................................16

Meta for Developers, *Advanced Matching*,
   https://developers.facebook.com/docs/meta-pixel/advanced/advanced-
   matching ...........................................................................................................7

Meta for Developers, *Reference*, https://developers.facebook.com/docs/meta-
   pixel/reference .................................................................................................5

Meta for Developers, *Conversion API*,
   https://developers.facebook.com/docs/marketing-api/conversions-
   api/parameters/fbp-and-fbc/ .........................................................................19

Facebook, *Cookies & Other Storage Technologies*,
   https://www.facebook.com/policy/cookies/ ..................................................19

Data Protection Comm'r, *Facebook Ireland Ltd: Report of Re-Audit* (Sept. 21,
   2012), http://www.europe-v-facebook.org/ODPC_Review.pdf .....................18

Scripps, *Privacy Notice*, https://corporate.discovery.com/privacy-policy/ ....................8

Defendant Scripps Networks, LLC ("Scripps") respectfully submits this memorandum of law in support of its motion to dismiss Plaintiffs Crystal Carter, Susan Cifelli, and Letitia Taylor's ("Plaintiffs") Complaint pursuant to Rules 12(b)(6) and 12(b)(1) of the Federal Rules of Civil Procedure.[1]

## PRELIMINARY STATEMENT

This lawsuit is a meritless attempt to stretch the Video Privacy Protection Act, 18 U.S.C. § 2710 *et seq.* (the "VPPA"), well beyond its intended scope in disregard of the plain text of the statute and relevant caselaw. As Plaintiffs acknowledge, the impetus for the VPPA was a controversy following President Ronald Reagan's nomination of Judge Robert Bork to the Supreme Court. Compl. ¶ 6. During the confirmation process, a movie rental store disclosed Bork's video tape rental history to a Washington newspaper. The newspaper then published a profile about Bork based on "the titles of 146 films his family had rented" from the store. S. REP. NO. 100-599, at 5 (1988).

Consistent with this context, the VPPA permits an aggrieved "consumer" of video tape service providers—defined as a "renter, purchaser, or subscriber of goods or services from a video tape service provider" (18 U.S.C. § 2710(a)(1))), to assert a claim against a video tape service provider who "knowingly" disclosed their "personally identifiable information" ("PII"). 18 U.S.C. § 2710(b)(1). Under the VPPA, PII includes "information that would readily permit an ordinary person to identify a specific individual's video-watching behavior."[2]

Plaintiffs' theory in this case that Scripps violated the VPPA through use of the Facebook

---

[1] The original Complaint was filed against Discovery Communications, LLC ("Discovery"), but per the stipulation ordered on July 27, 2022 (ECF No. 21), Scripps was substituted for Discovery as the Defendant.

[2] *Wilson v. Triller, Inc.*, No. 21-cv-11228 (JSR), 2022 WL 1138073, at *5-6 (S.D.N.Y. Apr. 18, 2022).

Tracking Pixel on HGTV.com fails as a matter of law because Plaintiffs have not pleaded even the most basic elements of a VPPA claim.

*First*, Plaintiffs are not "consumers" as defined in the VPPA. Plaintiffs do not allege that they rented or purchased any goods or services from Scripps, which they allege developed, owns, and operates the website HGTV.com. Compl. ¶ 2.[3] Rather, Plaintiffs' theory appears to be that they are "subscribers" within the meaning of the VPPA because they signed up for a free email newsletter (the "Newsletter"). *Id.* ¶¶ 2, 38. Plaintiffs' theory fails because the Newsletter, which Scripps uses for marketing purposes, is a separate and distinct part of Scripps's offerings from the video content available on HGTV.com. Indeed, another Court in this District expressed skepticism about Plaintiffs' very theory that subscribing to a newsletter—even a newsletter that links to video content—confers standing to bring claims under the VPPA. *See infra* Argument § I.A. Expanding the VPPA to encompass non-video services such as the Newsletter is inconsistent with its plain language, its legislative history, and the relevant caselaw.

*Second*, Plaintiffs do not plausibly allege that Scripps disclosed PII under the VPPA. 18 U.S.C. § 2710(b)(1). Plaintiffs allege that HGTV.com hosts the Facebook Tracking Pixel, a digital marketing tool that records actions taken by HGTV.com visitors while on the website. Compl. ¶¶ 12, 16. Plaintiffs further allege that Scripps transmits this "event" data to Facebook alongside user identifying information through: (a) Facebook cookies stored on the user's browser, or (b) the Facebook Tracking Pixel reading email addresses that HGTV.com visitors enter to sign up for the Newsletter. *Id.* ¶¶ 45-48. As to (a), the c_user cookie, which allegedly contains a user's unencrypted Facebook ID, Plaintiffs admit this is only transmitted if the user is

---

[3] HGTV is a lifestyle brand that produces content related to home design, decorating, and remodeling, as well as gardening, among other topics. *See* HGTV.com (discussed throughout Plaintiffs' Complaint).

logged into Facebook while they watch videos on HGTV.com.  Compl. ¶¶ 24-27.  Setting aside

whether unencrypted Facebook IDs permit ordinary persons to identify other individuals,

Plaintiffs do not allege that they were logged into Facebook while they watched videos on

HGTV.com, so they fail to allege the relevant information was transmitted here.  The other

cookies the Complaint discusses contain encrypted Facebook IDs and browser identifiers, which

do not constitute PII under the VPPA.  *Id.* ¶ 26.  As to (b), Plaintiffs do not identify the email

addresses that they allegedly put into HGTV.com, much less establish that their email addresses

identify them by name, so they again fail to adequately plead disclosure of PII.[4]

*Third*, Plaintiffs fail to plausibly allege that Scripps *knowingly* disclosed PII as required

by the VPPA.  18 U.S.C. § 2710(b)(1).  Plaintiffs only offer conclusory allegations asserting (a)

that Scripps discloses event data alongside identifiers, and (b) that Scripps knew Facebook would

combine event data with identifiers.  Compl. ¶¶ 45-48, 54.  But as explained herein, it is not

enough for Plaintiffs to simply allege that Scripps transmits information sufficient for

reconstructing PII.   Plaintiffs do not explain *how* Scripps knows Facebook *is* combining event

data with identifiers, and they do not allege facts plausibly establishing that Scripps knows

Facebook is doing so.  *See infra* Argument § I.C.

*Fourth*, Plaintiffs lack standing because they do not allege "concrete" injury under the

test announced by the Supreme Court in *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021).

Plaintiffs do not allege any physical, monetary, or other tangible injury.  Nor have they alleged

---

[4] Moreover, even if email addresses were adequately pled as constituting PII under the VPPA, Plaintiffs admit that after they entered their email addresses on the HGTV.com website, they watched videos <u>later</u>, undermining their allegation that email addresses were transmitted "alongside event data for videos" so as to permit ordinary persons to identify their video watching behavior.  *See* Plfs' Ltr. at 3-4, ECF No. 15 (admitting they watched videos "later"); *infra* Background, at 7 (Compl. ¶ 45).  The Court may take judicial notice of Plaintiffs' letter brief in resolving the motion to dismiss.  *In re Enron Corp.*, 379 B.R. 425, n.18 (S.D.N.Y. 2007) ("Judicial notice of public records such as court filings, is clearly appropriate").

an intangible injury that has a "close relationship" to a harm "traditionally" recognized as providing a basis for a lawsuit in American courts. *Id.* at 2200. Although American courts have recognized certain privacy torts, the touchstone of such claims is an invasion that is highly offensive to a reasonable person. Plaintiffs do not meet this standard. Indeed, at issue here are common, widespread digital marketing activities that are ubiquitous on the web. Moreover, the VPPA authorizes disclosure of PII concerning a consumer with "informed, written consent." 18 U.S.C. § 2710(b)(2)(B). The Privacy Notice posted on HGTV.com discloses that Scripps may collect user's email addresses and information about the videos that users watch, that it may share this information with third parties, and explains how users can opt out of targeted advertising. *See infra* Background, at 8-9.[5] Plaintiffs therefore at most accuse Scripps of a "bare procedural violation" of the VPPA, which is not "concrete" injury for Article III purposes.

## BACKGROUND

*The Parties.* Plaintiffs allege that Scripps "develops, owns, and operates hgtv.com," a website that features "'home and lifestyle content.'" Compl. ¶ 2. Plaintiffs allegedly entered their email addresses on HGTV.com to receive a free Newsletter via email that is distinct and separate from the video content that can be accessed directly on HGTV.com. Plaintiffs allege that they also created Facebook accounts and watched videos on HGTV.com. *E.g., id.* ¶¶ 51-53.

*HGTV.com.* A variety of content is available through HGTV.com, including the opportunity to sign up for a Newsletter delivered via email (rather than on the website itself)

---

[5] The Court can consider all of HGTV.com because it is incorporated by reference into the Complaint, is central to Plaintiffs' allegations, and its authenticity has not been questioned. *Orozco v. Fresh Direct, LLC*, No. 15-CV-8226 (VEC), 2016 WL 5416510, at *5 (S.D.N.Y. Sept. 27, 2016) (assessing the "totality" of a website "incorporated by reference" into a complaint "at the center of Plaintiff's allegations" in resolving a motion to dismiss); *see also Fernandez v. Zoni Language Ctrs., Inc.*, No. 15-cv-6066 (PKC), 2016 WL 2903274, at *3 (S.D.N.Y. May 18, 2016) ("Courts may also take judicial notice of information contained on websites where the authenticity of the site has not been questioned") (internal quotations and citations omitted).

containing articles of interest, still photos, and links back to other content. Compl. ¶ 43; Declaration of Blake J. Steinberg, Ex. A, HGTV Newsletter. Visitors can, but are not required to, receive the Newsletter by entering their email addresses into sign up boxes that appear in various locations on HGTV.com. *See* Compl. ¶ 38. Plaintiffs elected to receive a Newsletter. *Id.* ¶¶ 52, 57, 62. As Plaintiffs' Complaint indicates, the Newsletter is designed to encourage traffic to HGTV.com, and thus serves as a form of marketing for HGTV. *Id.* ¶ 43. But this Newsletter is distinct from the video content that is available on HGTV.com. Website visitors can watch videos on HGTV.com regardless of whether they sign up for the Newsletter (without providing any PII). Moreover, Plaintiffs do not allege that they requested or obtained any videos within the Newsletter; nor do they allege that Scripps disclosed to Facebook (or anyone else) that Plaintiffs requested or obtained any videos in the Newsletter (if they did so).

  ***The Alleged Disclosures by Scripps.*** Plaintiffs also allege that HGTV.com hosts a marketing tool called the Facebook Tracking Pixel to "better track analytics and target its advertisements[.]" *Id.* ¶ 36. Plaintiffs allege that Scripps embedded the Pixel on HGTV.com— not in the Newsletter they subscribed to (Compl. ¶¶ 12, 16-22)—and that Scripps uses the Pixel to record HGTV.com visitors' actions, which are sometimes referred to as "events." *See id.* ¶ 16.[6] Plaintiffs also allege that Scripps "compels" HGTV.com visitors' browsers to "transmit" cookies to Facebook. *Id.* ¶¶ 24-33. While Plaintiffs call attention to nine different Facebook cookies embedded on HGTV.com, *id.* at Figures 10, 11, 12, they only assert that **three** of these

---

[6] While Plaintiffs provide a slew of allegedly captured events such as "PageView" and "ViewContent," (*see id.* at Figure 1) not all of these events demonstrate video watching (as opposed to someone just landing on a page on a website). *See* Meta for Developers, *Reference*, https://developers.facebook.com/docs/meta-pixel/reference. As with HGTV.com, the Court can consider the entirety of the "Meta for Developers" website because it is incorporated by reference into Plaintiffs' complaint, *e.g.,* Compl. ¶ 37, n.43 (citing the Meta for Developers website), informs Plaintiffs' allegations, and its authenticity has not been called into question. *Fresh Direct*, 2016 WL 5416510, at *5; *Fernandez*, 2016 WL 2903274, at *3.

cookies "sufficiently permit[] an ordinary person to identify a specific individual's video viewing behavior": the c_user, fr, and _fbp cookies.  *Id.* ¶¶ 46-48 (alteration in original).

As for the c_user cookie, the Complaint alleges that it contains a "visitor's unencrypted Facebook ID[,]" which Plaintiffs allege constitutes PII.  Even if true, by Plaintiffs' own admission, this cookie is **only** transmitted when a visitor watches videos on HGTV.com "while logged into Facebook[.]"  *Id.* ¶ 24.  Yet nowhere in the Complaint do Plaintiffs allege that they were actually logged into Facebook when they viewed videos on HGTV.com.  Compl. ¶¶ 51-65.  Plaintiffs thus never allege that information from the c_user cookie was actually transmitted, and they therefore fail to allege that **unencrypted Facebook IDs were ever actually transmitted**.  Moreover, it is not clear that an unencrypted Facebook ID even constitutes PII.[7]

As for the fr cookie and _fbp cookies, Plaintiffs allege that the fr cookie "contains, at least, an encrypted Facebook ID and browser identifier" and that the _fbp cookie "contains, at least, an unencrypted value that uniquely identifies a browser."  *Id.* ¶ 26.  Both cookies are allegedly transmitted regardless of whether the website visitor is logged into Facebook or has a Facebook account.  *Id.* ¶¶ 25-27, nn.25, 30.  But these cookies do not contain PII.  Plaintiffs never allege that ordinary persons could unencrypt the fr cookie's Facebook ID, an ID which is encrypted by Facebook.  Similarly, Plaintiffs do not adequately explain how a "browser identifier" permits ordinary persons to identify them; they do not, for instance, allege that browser identifiers contain their names.  *Id.* ¶¶ 26, 28, 47, 48.

Plaintiffs further allege that Scripps uses Advanced Matching, a Pixel feature that scans "for recognizable form field and other sources on your website that contain information such as

---

[7] *See In re Nickelodeon Consumer Priv. Litig.*, No. CIV.A. 12-07829, 2014 WL 3012873, at *11-12 (D.N.J. July 2, 2014) (declining to decide whether Facebook IDs are PII under the VPPA and indicating disclosure must link a "person to a specific video choice" to support a VPPA claim).

first name, last name, and email." *Id.* ¶ 35. Plaintiffs note that when information is transmitted

through Advanced Matching, it is "'hashed,' meaning it is '[a] computed summary of digital data

that is a one-way process[,]'" and "cannot be reversed back into the original data." *Id.*[8]

Plaintiffs allege that when they input their email addresses to sign up for the Newsletter,

Scripps disclosed their email addresses to Facebook through the Facebook Tracking Pixel's

Advanced Matching feature. *See* Compl. ¶¶ 35, 53, 58, 63. Plaintiffs, however, do not allege

that they ever provided their names to Scripps or that their names were collected by Facebook

through the HGTV.com website in any manner. Indeed, to sign up for the Newsletter, website

visitors are required only to enter their email addresses, and Plaintiffs do not allege that the email

addresses they used to sign up contained their names or otherwise identified them. Plaintiffs also

admit that after they entered their email addresses to sign up for the Newsletter, they only "**later**"

watched videos on HGTV.com. *See* Plfs' Ltr. at 3-4, ECF No. 15 (emphasis added) ("When first

subscribing, they entered their email address . . . **Later**, when they watched videos on hgtv.com .

. . .").[9] By conceding that it was later, Plaintiffs contradict their allegation that "Advanced

Matching parameters" were transmitted "alongside event data for videos." Compl. ¶ 45.[10]

Plaintiffs allege that "[t]hrough the Facebook Tracking Pixel's code, these cookies

combine the identifiers with event data," and that identifiers are disclosed "alongside event data

---

[8] Hashing converts email addresses into strings of numbers and letters; actual email addresses are not transmitted. *See* Meta for Developers, *Advanced Matching*, https://developers.facebook.com/docs/meta-pixel/advanced/advanced-matching (cited in Plaintiffs' Complaint at footnote 43). The Court can consider the sources cited in the Complaint to be incorporated into the Complaint by reference. *In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 354, 368 (S.D.N.Y. 2015), *aff'd* (2d Cir. Mar. 21, 2016) (considering the text of a cited announcement to be incorporated by reference into plaintiffs' complaint).

[9] The Court may take judicial notice of Plaintiffs' letter brief. *Enron*, 379 B.R. at n.18.

[10] For webpages with multiple videos, the URLs transmitted would not indicate what video was actually watched, as suggested by Plaintiffs' screenshots showing transmission of event data in the Complaint. *Id.* at Figures 2-9.

for videos[.]" *See* Compl. ¶¶ 34, 45-48.  They also allege in conclusory fashion that Scripps

knew Facebook would combine event data with identifiers, and that Scripps "knowingly

disclosed" Plaintiffs' information to "build audiences on Facebook and retarget them for its

advertising campaigns." *Id.* ¶¶ 54, 86.[11]  But Plaintiffs never adequately explain *how* Facebook

combines Facebook IDs, browser identifiers, and email addresses with event data or how Scripps

knows that Facebook *is* doing so.

***The Privacy Notice.***  HGTV.com also posts a Privacy Notice disclosing: (a) that Scripps

collects users' email addresses when individuals sign up to receive the Newsletter; (b) that

Scripps collects "information about how you use our Services, such as . . . **content (including**

**<u>video</u> content)** . . . **you view** within the Services;" (c) that Scripps "may share information with

third parties with whom we have business relationships . . . for purposes such as offering

products and services that may interest you[;]" and (d) how users can "opt out" of targeted

advertising.[12]  The Privacy Notice is linked in various locations on HGTV.com, including

directly alongside the Newsletter sign-up shown below in Figure A.

**Figure A**



In addition to being linked alongside other Newsletter sign-up boxes on HGTV.com apart

---

[11] Plaintiffs vaguely reference an off-site activity report, but it is not clear what this third party
document demonstrates concerning Scripps' knowledge.  Compl. at Figure 18.

[12] *See*, *e.g.*, Scripps, *Privacy Notice*, https://corporate.discovery.com/privacy-policy/ (emphasis
added).  Because the Privacy Notice is posted on HGTV.com, the Court can consider it in full.
*Fresh Direct*, 2016 WL 5416510, at *5; *see also Triller*, 2022 WL 1138073, at *1 (finding
defendants' privacy policy to be incorporated into complaint by reference in a VPPA action).

from the one shown above in Figure A, the Privacy Notice is also linked at the bottom of the website in the footer shown in the below screenshot, Figure B.[13]

**Figure B**



| Visitor Agreement | Privacy Notice | AdChoices | About | Products | News |
| | | | CA Do Not Sell My Info | | |

## LEGAL STANDARD FOR MOTION TO DISMISS

Federal Rule of Civil Procedure 12(b)(6) requires dismissal of a complaint that lacks "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In determining a complaint's adequacy, a court must disregard conclusory allegations and legal conclusions, which are not entitled to the assumption of truth, and determine whether the remaining "well-pleaded factual allegations" suggest that the plaintiff has a plausible—as opposed to merely conceivable—claim for relief. *Id.* at 679. In VPPA actions, this District has recognized that plaintiffs' allegations must "raise a right of relief above the speculative level." *Austin-Spearman v. AMC Network Ent. LLC*, 98 F. Supp. 3d 662, 665 (S.D.N.Y. 2015); *Triller*, 2022 WL 1138073, at *3.

A complaint must also be dismissed under Federal Rule of Civil Procedure 12(b)(1) "for lack of subject matter jurisdiction if the court 'lacks the statutory or constitutional power to adjudicate it,' such as when . . . the plaintiff lacks constitutional standing to bring the action." *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.á.r.l.*, 790 F.3d 411, 417 (2d Cir. 2015) (internal citations omitted). To establish constitutional standing, a plaintiff must show "(i) that

---

[13] HGTV.com uses the terms "Privacy Policy" and "Privacy Notice" to refer to the same document.

9

he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion*, 141 S. Ct. at 2203 (internal citations omitted). *TransUnion* also directs federal courts to consider whether a plaintiff's "asserted harm has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *Id.* at 2197. These requirements ensure that federal courts, in accordance with their Article III authority, resolve only real controversies "with real impact on real persons." *Id.* at 2203.

## ARGUMENT

## I. PLAINTIFFS FAIL TO STATE A CLAIM TO RELIEF UNDER THE VPPA

### A. HGTV.com's Newsletter is distinct and set apart from video content.

Based on the plain language of the VPPA, an individual must purchase, rent, or subscribe to video content from a video tape service provider to be protected under the statute. The VPPA prohibits knowing disclosure of PII concerning "renter[s], purchaser[s], or subscriber[s] of goods or services from a video tape service provider[.]" 18 U.S.C. § 2710(a)(1) (emphasis added). A "video tape service provider" is defined, in relevant part, as "any person, engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials[.]" *Id.* § 2710(a)(4) (emphasis added).[14] The VPPA defines PII to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider[.]" *Id.* § 2710(a)(3) (emphasis added).

Here, Plaintiffs do not allege that they paid anything to Scripps, Compl. ¶¶ 51-65, ruling out the possibility that they are "renters" or "purchasers," and leaving only the question of

---

[14] The statute also defines video tape service providers as "any person or other entity to whom a disclosure is made under subparagraph (D) or (E) of subsection (b)(2)[.]" *Id.* Subparagraphs (D) and (E) of subsection (b)(2) permit certain disclosures of PII "for the exclusive use of marketing goods and services directly to the consumer," and certain disclosures incident to the video tape service provider's "ordinary course of business." 18 U.S.C. §§ 2710(b)(2)(D)(ii), 2710(b)(2)(E).

whether they are "subscribers."  Plaintiffs are not subscribers under the VPPA because the

Newsletter—the only thing Plaintiffs even allege they signed up for—is not video material or a

video service.  It is marketing content delivered to users via email and is entirely separate from

any video content available on HGTV.com which is available for free to any person visiting the

HGTV.com website regardless of whether that person signs up for the Newsletter.  Moreover,

the Newsletter consists of text articles, still photos and links to other content.  *Supra*

Background, at 4-5 (Steinberg Decl. Ex. A).  Plaintiffs do not allege that they viewed video

content in the Newsletter or that Scripps disclosed requests to view or obtain such content within

it.  *Supra* Background, at 5.

This District's precedent supports Scripps's plain language interpretation that signing up

for the Newsletter is insufficient to make an individual a subscriber under the VPPA.  In *Austin-

Spearman v. AMC Network Entertainment LLC*, the Court found that the plaintiff, who browsed

the AMC website and watched video clips from *The Walking Dead*, was not a "consumer" within

the meaning specified in the VPPA based on the pleadings.  98 F. Supp. 3d 662, 664, 668

(S.D.N.Y. 2015).  The Court also considered evidence that the plaintiff later offered in motion to

dismiss briefing and in a letter following oral argument that she had signed up for *The Walking

Dead* newsletter, and therefore was a "consumer" under the VPPA.  *Id.* at 671.  This newsletter

contained written material **and** linked to **<u>video</u>** content on the AMC website.  *Id.* (citing *Austin-

Spearman v. AMC Network Ent. LLC*, No. 14-cv-06840 (S.D.N.Y. Mar. 27, 2015), ECF No. 28).

Although it granted leave to amend, the Court was "skeptical" that the plaintiff would be able to

adequately allege that she was a subscriber under the VPPA, noting that her "proposed

amendment raises a host of troubling questions," including "whether a plaintiff can constitute a

subscriber under the VPPA if she subscribes only to a portion of the provider's services that are

distinct and set apart from its provision of videos[.]" *Austin-Spearman*, 98 F. Supp. 3d at 671. Plaintiffs here assert the same troubling theory of liability.

Scripps's interpretation also comports with precedent from outside this jurisdiction. In *United States v. Shultz*, the defendant argued for "an exceptionally broad definition of PII[,]" claiming "the term 'services' in the phrase 'specific video materials or services' is completely divorced from and not modified by 'video' or 'specific video.'" No. 16-10107-01-EFM, 2018 WL 534333, at *3 (D. Kan. Jan. 24, 2018). Based on this interpretation, the defendant argued that "the VPPA may be violated . . . by identifying a person as having requested or obtained *any* service from a video tape service provider." *Id.* (emphasis in original). The defendant claimed that "if not done in accordance with the VPPA's disclosure provisions, the simple identification of a person as a consumer of the provider violates the VPPA . . . regardless of whether the consumer requested or obtained audio visual materials or audio visual services." *Id.* The Court rejected this interpretation, explaining the defendant pointed "to no authority to support his proposed interpretation of the term PII; nor has the Court located any." *Id.* at *3-4.

The legislative history of the VPPA is also consistent with Scripps's interpretation of the statute. As Plaintiffs acknowledge (Compl. ¶ 6), Congress passed the VPPA directly in response to the publication of "a profile of Judge Robert H. Bork based on the titles of 146 films his family had rented from a video store." S. Rep. No. 100-599, at 5. Passed in 1988 in the immediate aftermath of that episode, the VPPA had video rental stores in its sights—*not* entities that distribute non-video content such as the Newsletter. *Id.* Moreover, if Congress had wanted to expand the VPPA to cover written materials, it could easily have done so, but did not. *See id*. at 12 ("The definition of personally identifiable information includes the term 'video' to make clear that simply because a business is engaged in the sale or rental of video materials or services

[sic] does **not** mean that **all** of its products or services are within the scope of the bill," (emphasis added)); *see also In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 284 (3d Cir. 2016) (explaining that "Congress's purpose in passing the Video Privacy Protection Act was quite narrow[,]" and stating, "[w]e do not think that [Congress] intended for the law to cover factual circumstances far removed from those that motivated its passage." (alteration in original)).

Indeed, in legislation that became the VPPA, "'the bill's sponsors, Senators Leahy, Grassley, Simpson and Simon, included a similar protection for library borrower records, recognizing that there is a close tie between what one views and what one *reads*.'" S. REP. NO. 100-599, at 8 (emphasis added). This proposed version of the VPPA would have prohibited libraries from disclosing information which identified their "patrons" as having "requested or obtained specific materials or services from a . . . library[.]" 134 Cong. Rec. S5397-01 (1988). "Patron," in turn, was defined as "any individual who requests or receives (A) services within a library; or (B) books or other materials on loan from a library[.]" *Id.* This version of the VPPA did not become law because "the committee was unable to resolve questions regarding the application of such a provision for law enforcement." S. REP. NO. 100-599, at 8.

State analogues to the federal VPPA comport with Scripps's interpretation. These statutes explicitly protect individuals who bought or rented videos. *See, e.g.,* N.Y. Gen. Bus. Law §§ 672, 673, 674 (prohibiting certain disclosures of PII and defining PII as "any information which identifies a person as having requested or obtained specific *video* materials or services from a video tape service provider or video tape seller" (emphasis added)); Del. Code Ann. tit. 11, § 925(a) ("A videotape distributor may not wrongfully disclose an individual or summary listing of any videotapes purchased or rented by a protected individual from the videotape distributor" (emphasis added)); Conn. Gen. Stat. Ann. § 53-450(a) ("All personally identifiable

information contained in the circulation records of any person renting videotape cassettes shall be confidential.").  Indeed, when Michigan passed its own version of the VPPA, it became "the only [state analogue to the VPPA] that restricts disclosure by sellers of written materials[.]" *Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 447 n.13 (S.D.N.Y. 2016) (alteration in original).  Michigan did so expressly, defining "customer" as "an individual who **purchases, rents, or borrows a book, [or] other written material** . . . ."  Mich. Comp. Laws Ann. § 445.1711(a) (emphasis added) (alteration in original).[15]

Moreover, merely entering their email addresses to receive the Newsletter does not make Plaintiffs "subscribers" under the VPPA.  To be a subscriber under the VPPA, a plaintiff must allege that they have undertaken an "ongoing commitment or relationship" with the video tape service provider.  *See*, *e.g.*, *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1257 (11th Cir. 2015).  But Plaintiffs have not alleged an "ongoing commitment or relationship" with Scripps.  They merely allege they entered their email address.  Plaintiffs can opt out of receiving the Newsletter "without consequences whenever [they] like[]," and "never access its content again."  *Id.* at 1257-58 (alteration in original) ("[T]he free downloading of a mobile app on an Android device to watch free content, without more, does not a 'subscriber' make"); *see also Austin-Spearman*, 98 F. Supp. 3d at 669 (finding that the plaintiff was not a subscriber under the VPPA, noting that she could "decide to never visit the AMC website ever again," and, as here, "that decision will have zero consequences, costs, or further obligations.").  There is no ongoing commitment to receive the Newsletter, and certainly no ongoing commitment to subscribe to video services.

Plaintiffs cannot manufacture an "ongoing commitment or relationship" with Scripps

---

[15] In addition, even if signing up for the Newsletter meant Plaintiffs had subscribed to a video service, Plaintiffs do not allege that the Facebook Tracking Pixel is embedded within the Newsletter (*supra* Background, at 5 (Compl. ¶¶ 12, 16-22)), meaning that by their own admission, what they signed up for does not disclose the alleged PII.

merely by alleging that they entered their email address to receive the Newsletter.  In *Perry v. Cable News Network, Inc.*, the plaintiff alleged that CNN's mobile app, "without a user's knowledge," tracked "the user's views of news articles and videos[.]"  854 F.3d 1336, 1339 (11th Cir. 2017).  He further alleged that when a user closed the CNN app, CNN sent "the collected record of viewing activity to a company called Bango, a third party company that conducts data analytics."  *Id.*  The Court, following *Ellis*, found that the plaintiff was "not a subscriber of CNN because he [had] not demonstrated an ongoing commitment or relationship with CNN."  *Id.* at 1342 (alteration in original).  Undeterred, the plaintiff then attempted to amend his complaint in order to establish an ongoing commitment or relationship with CNN "by claiming that he received some exclusive or restricted content on the CNN App based on his relationship with his cable television provider and that he made payments to CNN."  *Id.* at 1342.  But the Court rejected this argument too, finding that it showed "a commitment to ***only*** [plaintiff's] cable television provider, rather than to CNN."  *Id.* (alteration in original) (emphasis added).  If access to exclusive content through a cable television subscription and payments to CNN were not enough to establish that the plaintiff in *Perry* was a subscriber, certainly signing up for the free Newsletter which is separate and distinct from the video content on HGTV.com should not be even remotely close enough to make Plaintiffs subscribers under the VPPA here.

Furthermore, it is not even clear that the Newsletter is a "good[]" or "service[]" under the VPPA.  Although neither "goods" nor "services" are defined in the statute, its legislative history, or cases applying the VPPA, 18 U.S.C. § 2710; S. Rep. No. 100-599; *e.g., Austin-Spearman*, 98 F. Supp. 3d 662, the Newsletter likely is neither a good nor a service under the VPPA, because it is not tangible chattel or labor.  *See* N.Y. Tax Law § 208.11 ("The term 'tangible personal property' means ***corporeal*** personal property, such as . . . ***goods***. . . ." (emphasis added)); N.Y.

15

City Incorp. Bus. Tax § 2 (same); *Leisure Vue, Inc. v. Comm'r of Tax'n & Fin.*, 172 A.D.2d 872, 873 (3d Dep't 1991) ("'goods' means 'tangible movable personal property having intrinsic value'" (citing Webster's Third New International Dictionary 978 [unabridged 1981])). "'Services' generally represent a bargained-for or anticipated provision of labor from one party to another." *Delta Air Lines, Inc. v. New York City Dep't of Consumer Affs.*, 564 F. Supp. 3d 109, 120 (E.D.N.Y. 2021) (citation omitted)); *see also Service*, Black's Law Dictionary (11th ed. 2019) (defining service as "[l]abor performed in the interest or under the direction of others; specif., the performance of some useful act or series of acts for the benefit of another, usu. for a fee."). The free Newsletter is not a good or a service under the VPPA. It is a marketing tool to increase engagement with the HGTV brand. It is certainly not as corporeal as a video tape and does not constitute the provision of labor to the end user. For this reason as well, Plaintiffs cannot bring claims for violations of the VPPA.[16]

**B.     Plaintiffs have not adequately alleged that Scripps disclosed PII.**

The VPPA specifies that PII "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider[.]" 18 U.S.C. § 2710(a)(3). Here, Scripps allegedly compels HGTV.com visitors' browsers to transmit cookies to Facebook, including c_user cookies which contain HGTV.com visitors' unencrypted Facebook IDs. Plaintiffs have not adequately alleged that any Facebook IDs would enable an ordinary person to identify an individual as having watched specific videos, the relevant standard. *Triller*, 2022 WL 1138073, at *5-6. But the question is academic here

---

[16] The better understanding of the Newsletter is that it is an "advertisement" which falls outside the ambit of the VPPA. In the context of the Telephone Consumer Protection Act, for example, an "advertisement" is defined as "any material advertising the commercial availability or quality of any property, goods, or services." 47 C.F.R. § 64.1200(f)(1). *See also Advertisement*, Black's Law Dictionary (11th ed. 2019) ("A commercial solicitation; an item of published or transmitted matter made with the intention of attracting clients or customers.").

because, by Plaintiffs' own admission, the c_user cookie is *only* transmitted to Facebook if a user watches videos on HGTV.com *while* logged into Facebook. Crucially, Plaintiffs here have not alleged that they were logged into Facebook while they watched videos, so they do not allege that **un**encrypted Facebook IDs were in reality transmitted to Facebook in this case. *Supra* Background, at 6 (Compl. ¶¶ 24, 51-65). This insufficiency in the Complaint means that Plaintiffs have failed to allege that Scripps transmitted PII.

The other cookies the Complaint discusses—which contain encrypted Facebook IDs and browser identifiers—do not constitute PII under the VPPA. *See supra* Background, at 6 (Compl. ¶ 26). In *Bernardino v. Barnes & Noble Booksellers, Inc.*, No. 17-CV-04570 (LAK) (KHP), 2017 WL 3727230, at *8 (S.D.N.Y. Aug. 11, 2017), *report and recommendation adopted*, No. 17-CV-4570 (LAK), 2017 WL 3726050 (S.D.N.Y. Aug. 28, 2017), plaintiff argued that Facebook's fr cookie constituted PII under the VPPA. The Court disagreed, denying plaintiff's requested injunction, and finding specifically with respect to the Facebook fr cookie that because "there is no binding precedent to support [the plaintiff's] interpretation of PII and, on the contrary, there is case law to support Barnes & Noble's position that the alleged disclosure may not constitute PII, [plaintiff] has not made a clear and substantial showing of success on the merits." *Id.* at *9 (alteration in original).

Moreover, and beyond *Bernardino*'s holding that encrypted Facebook IDs and browser identifiers do not constitute PII, Plaintiffs do not explain how encrypted Facebook IDs and browser identifiers enable an ordinary person to identify a specific HGTV.com visitor. If a Facebook ID is encrypted, as in the case of the fr cookie, it would not be decipherable by an ordinary person, because only those with the encryption key could unencrypt it. *See In re Keurig Green Mountain Single-Serve Coffee Antitrust Lit.*, No. 14 MD 2452 (VSB) (SLC), 2022 WL

1082087, at *13 (S.D.N.Y. Apr. 11, 2022) ("The computers Keurig issued to its employees were encrypted, meaning they could only be accessed using an encryption key.").

Critically, Plaintiffs do not allege that an ordinary person could decipher these IDs, which are encrypted by Facebook. *See supra* Background, at 6 (Compl. ¶ 26); *see also Robinson v. Disney Online*, 152 F. Supp. 3d 176, 178, 184 (S.D.N.Y. 2015) (dismissing a VPPA action where the plaintiff alleged that the defendant transmitted a "hashed serial number associated with the user's Roku device" to a third party, emphasizing that "Disney has also not disclosed a 'correlated look-up table' that would enable Adobe to link the hashed serial number of Robinson's Roku device and his viewing choices to his identity."). Indeed, "information which is not otherwise PII [cannot] somehow become PII because of the potential, however remote, of a third party to '**reverse engineer**' a disclosure using data gathered from other sources." *Disney*, 152 F. Supp. 3d at 183 (alteration in original) (emphasis added).

Plaintiffs also omit that, according to the same report that they cite in footnote 26 of the Complaint, the Facebook ID in the fr cookie is "re-encrypted **every hour** to a different value." Data Protection Comm'r, *Facebook Ireland Ltd: Report of Re-Audit* (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf (emphasis added).[17] This frequent re-encryption makes it even more unlikely that an ordinary person would be able to use the fr cookie to identify specific HGTV.com visitors.

As for browser identifiers, Plaintiffs do not allege that this information contains their name or otherwise identifies them, and therefore fail to establish that browser identifiers constitute PII. *Supra* Background, at 6 (Compl. ¶¶ 26, 28, 47, 48). Plaintiffs also do not rule out the possibility that browser identifiers simply identify the browser they used to access

---

[17] The Court can consider the sources cited in Plaintiffs' Complaint to be incorporated into the Complaint by reference. *In re PetroChina*, 120 F. Supp. 3d at 354, 368.

HGTV.com, which plainly would not be sufficient for an ordinary person to identify HGTV.com visitors.  Plaintiffs simply allege (without more) that by disclosing "browser identifiers alongside event data for videos, HGTV discloses information sufficiently permitting an ordinary person to identify a specific individual's video viewing behavior."  *Id.* ¶ 48.

This naked conclusion is not enough, for the sources Plaintiffs cite in their Complaint do not explain how browser identifiers could identify them.  Facebook's Cookies Policy, which Plaintiffs cite in footnotes 28 and 29, does not explain how browser identifiers permit ordinary people to identify specific individuals.  Facebook, *Cookies & Other Storage Technologies*, https://www.facebook.com/policy/cookies/.  Similarly, the webpage that Plaintiffs cite at footnote 27 when discussing the _fbp cookie suffers from this same lack of clarity as to browser identifiers.  Meta for Developers, *Conversion API*, https://developers.facebook.com/docs/marketing-api/conversions-api/parameters/fbp-and-fbc/.[18] At most, this webpage shows a string of letters and numbers in depicting what the value of the fbp cookie "could look like."

**Figure C**



fb.1.1596403881668.1116446470

Plainly, an ordinary person would not know where to even begin to identify an HGTV.com visitor from this indecipherable list of numbers.

Furthermore, Plaintiffs have not adequately alleged that Scripps disclosed PII by transmitting email addresses to Facebook through the use of Advanced Matching.  They acknowledge that data transmitted through Advanced Matching is "hashed" and "cannot be

---

[18] The Court can consider the sources cited in Plaintiffs' Complaint in resolving the motion.  *In re PetroChina*, 120 F. Supp. 3d at 354, 368.

reversed back into the original data." *Supra* Background, at 6-7 (Compl. ¶ 35). Even if recipients could somehow match hashed email addresses with other data, that would not mean that Scripps disclosed PII under the VPPA. *See Disney*, 152 F. Supp. 3d at 181 ("If nearly any piece of information can, with enough effort on behalf of the recipient, be combined with other information so as to identify a person, then the scope of PII would be limitless."). Also, even if the email addresses were not hashed, email addresses often do not identify individuals by name, and Plaintiffs have not alleged that the email addresses they used to sign up for the Newsletter contained their names or otherwise identified them. In fact, Plaintiffs have not alleged that they provided their names to Scripps at all. *Supra* Background, at 7 (Compl. ¶¶ 53, 58, 63).

Even if Plaintiffs' email addresses did identify them by name, Plaintiffs plead only that "HGTV knows Facebook will match the Advanced Matching parameters with a subscriber's subsequent activity[.]" Compl. ¶ 40. That vague allegation does not help Plaintiffs, since they have failed to plead that they watched videos close in time to when they input their email addresses to sign up for the Newsletter. In fact, Plaintiffs have admitted that only "later" did they watch videos, s*ee* Plfs' Ltr. at 4, ECF No. 15, which controverts their allegation that Scripps transmitted "Advanced Matching parameters alongside event data for videos." *Supra* Background, at 7 (Compl. ¶ 45).[19] Indeed, just this past April, this District dismissed a VPPA claim where the plaintiff, as here, failed to allege that a defendant social media app operator disclosed PII, noting that "as alleged," third parties had to "pair" the user's app assigned identification number "with information from a user's [app] profile page, which may or may not contain various personal information about the user[.]" *Triller,* 2022 WL 1138073, at *6

---

[19] The Court may take judicial notice of Plaintiffs' letter brief. *Enron*, 379 B.R. at n.18. Moreover, as explained previously, where multiple videos appear on the same webpage on HGTV.com, it would not even be clear from the URL included in the allegedly transmitted event data which video was watched. *Supra* Background, at n.10 (Compl. at Figures 2-9).

(alteration in original).

And in this same decision, this District found that the Third Circuit's "narrower" interpretation of PII was more appropriate than the First Circuit's broader approach. *Id.* at *5-6 ("As a matter of statutory interpretation, it appears that the narrower definition is the correct one."). The Third Circuit has found that PII is "the kind of information that would readily permit an ordinary person to identify a specific individual's video-watching behavior[,]" *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d at 284, 290, and the First Circuit has found that PII is "information reasonably and foreseeably likely to reveal which . . . videos [a person] has obtained." *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 486 (1st Cir. 2016) (alteration in original). Here, applying the standard endorsed in *Triller*, Plaintiffs have not sufficiently alleged that Scripps disclosed information that would readily permit ordinary people to identify specific HGTV.com visitors' video-watching behavior.

**C.** **Plaintiffs have not sufficiently pleaded that Scripps "knowingly" disclosed PII.**

Even if Plaintiffs did adequately allege that Scripps disclosed PII under the VPPA— which they have not—Plaintiffs also have not sufficiently alleged that Scripps *knowingly* disclosed any information that "identifies a person as having requested or obtained specific video materials[.]" 18 U.S.C. §§ 2710(a)(3), 2710(b)(1). Indeed, disclosure alone does not violate the VPPA; it must be a *knowing* disclosure. That is, Plaintiffs must allege that Scripps *knew* that the information it disclosed identified specific individuals as having "requested or obtained specific video materials," which they have not done. *In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090, 1090, 1105 (N.D. Cal. 2015) (granting Hulu's motion where plaintiffs could not establish whether "Hulu knew that Facebook might link the user-identifying information in the c_user cookie with title-bearing watch-page addresses" to construct PII). "The point of the VPPA, after all, is not so

much to ban the disclosure of user or video data; **it is to ban the disclosure of information connecting a certain user to certain videos.**" *Id.* at 1095 (emphasis added).

Like the unsuccessful *Hulu* plaintiffs, Plaintiffs here do not sufficiently allege that Scripps ever knew that event data and identifiers were transmitted such that Facebook did "combine those discrete things to reconstruct PII." *Id.* at 1098. Indeed, the Complaint never explains *how* Facebook combines event data with Facebook IDs, browser identifiers, and email addresses, let alone how Scripps *knows* how and that Facebook does so. As *Hulu* underscores, it is not enough for Plaintiffs to simply allege that Scripps transmits information sufficient for reconstructing PII, since the VPPA demands that Scripps "knowingly" disclosed PII under the VPPA. *In re Hulu Priv. Litig.*, 86 F. Supp. 3d at 1098; *see Disney*, 152 F. Supp. 3d at 181 (if a third party has to "reverse engineer" PII, there can be no knowing disclosure).

Indeed, the "knowledge element of the VPPA violation is intertwined with the definition of PII." *Bernardino*, 2017 WL 3727230, at *9. This District has therefore held that if, as here, a defendant "did not think it was conveying PII, then there could be no knowledge of the conveyance[.]" *Id.* Relatedly, under the VPPA, Scripps is responsible for knowing the "nature of the information actually disclosed," not "the informational capabilities of any third-party recipient" like Facebook. *See Disney*, 152 F. Supp. 3d at 181-82. So, even if Scripps knew what Facebook might do with information collected, that would be insufficient to allege knowledge. *Bernardino*, 2017 WL 3727230, at *9 (finding "whether [defendant Barnes & Noble] knew what Facebook might do with the information" was irrelevant to the VPPA knowledge inquiry (alteration in original)). In sum, merely alleging that Scripps uses the Facebook Tracking Pixel and Advanced Matching and explaining these tools' functionality—without also sufficiently alleging that Scripps knew that it shared information enabling ordinary persons to know what

videos specific HGTV.com visitors watched—does not state a VPPA claim.

## II.   **PLAINTIFFS LACK ARTICLE III STANDING**

Plaintiffs also lack standing under *TransUnion*, which New York federal courts have found "substantially and materially changed" their analysis of Article III standing in putative consumer class actions. *Ciccone v. Cavalry Portfolio Servs.*, *LLC*, No. 21-cv-2428 (JS) (JMW), 2021 WL 5591725, at *3 (E.D.N.Y. Nov. 29, 2021). In *TransUnion*, a class alleged that the defendant credit reporting agency violated the Fair Credit Reporting Act ("FCRA") by failing to use reasonable procedures to ensure the accuracy of internally maintained credit files. 141 S. Ct. at 2200. As the Supreme Court succinctly emphasized, "No concrete harm, no standing." *Id.* Physical, monetary or other tangible injury are typically sufficiently concrete to confer standing. *Id.* at 2204. Intangible harm may be sufficient if the "harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts[.]" *Id.* at 2200, 2204. The Court observed that Congress's view may be "instructive" in determining whether a harm is concrete, but cautioned "an injury in law is not an injury in fact." *Id.* at 2204-05.

Plaintiffs do not establish that they suffered a concrete injury under the *TransUnion* tests. For starters, they do not and cannot allege any physical, monetary, or other tangible injury. Instead, their theory seems to be that Scripps's alleged transmission of email addresses, information collected by cookies, and website visit event data for the purpose of marketing goods and services to Plaintiffs is a concrete intangible harm. This theory fails for two reasons. First, the alleged transmission of this information does not bear a "close relationship" to a harm traditionally recognized as providing a basis for litigation in American courts. While federal courts have recognized certain privacy torts, such as intrusion upon seclusion, the touchstone of such claims is an invasion that would be highly offensive to a reasonable person. *Ciccone*, 2021

WL 5591725, at *3 (applying *TransUnion* and holding that an alleging a statutory violation based on disclosure of the plaintiff's name, address, status as a debtor, and the precise amount of their debt to a third party vendor did not constitute a concrete injury because, as here, the disclosure would not be highly offensive to a reasonable person); *see also Sputz v. Alltran Fin., LP*, No. 21-CV-4663 (CS), 2021 WL 5772033, at *5 (S.D.N.Y. Dec. 5, 2021) (citation omitted) (pointing to "'sexual relations,' 'family quarrels,' and 'unpleasant or disgraceful illnesses' as examples of the 'private facts' covered by the tort of public disclosure of private facts" to conclude "communication of purported non-payment of a relatively *de minimis* debt to a mailing vendor" would not be highly offensive to a reasonable person). Plaintiffs do not and cannot allege that the alleged disclosures would be highly offensive to a reasonable person.

Second, the Privacy Notice on HGTV.com discloses that Scripps can collect information that identifies visitors and information about visitors' use of the website, and that this information may be used to provide marketing and third-party advertising to the visitor. *Supra* Background, at 8-9. Thus, Plaintiffs' allegation boils down to the claim that the disclosure in the Privacy Notice on HGTV.com does not meet the requirements of a "distinct and separate" consent set forth in 18 U.S.C. § 2710(b)(2). This alleged failure to comply with the VPPA's consent requirements, where the Privacy Notice was disclosed, and only resulted in superior marketing to the visitor, is not analogous to harms traditionally recognized at common law that would be highly offensive to a reasonable person. *See Zevon v. Am. Express Co.*, No. 1:20-CV-4938-GHW, 2021 WL 4330578, at *3 (S.D.N.Y. Sept. 22, 2021) (finding that plaintiff failed to establish a concrete injury where she alleged that she received the requisite information in the wrong format, emphasizing that the plaintiff did not "allege any downstream consequences" from receipt of the information in the wrong format). Rather, it is the type of alleged "bare

procedural violation" that does not satisfy Article III's "concrete injury" requirement. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341-42 (2016) (noting that a bare procedural violation of the FCRA may result in no harm). Accordingly, Plaintiffs lack Article III standing to pursue their claim.

## CONCLUSION

For all the foregoing reasons, Scripps respectfully requests that the Court dismiss the Complaint in its entirety.

Dated: New York, New York
      August 2, 2022

Respectfully submitted,

*/s/ David L. Yohai*        
David L. Yohai
David R. Singh
Randi W. Singer
David E. Yolkut
Blake J. Steinberg

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Phone: (212) 310-8000
Fax: (212) 310-8007
david.yohai@weil.com
david.singh@weil.com
randi.singer@weil.com
david.yolkut@weil.com
blake.steinberg@weil.com

*Attorneys for Defendant Scripps Networks, LLC*