## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

CRYSTAL CARTER, SUSAN CIFELLI, and
LETITIA TAYLOR, individually and on behalf of
all others similarly situated,

                         Plaintiffs,

      v.

SCRIPPS NETWORKS, LLC,

                    Defendant.

Civil Action No. 1:22-cv-02031-PGG

Hon. Paul G. Gardephe

## PLAINTIFFS' MEMORANDUM IN OPPOSITION
## TO DEFENDANT'S MOTION TO DISMISS

Dated: August 30, 2022

**BURSOR & FISHER, P.A.**
Joshua D. Arisohn
Philip L. Fraietta
888 Seventh Avenue
New York, NY 10019
Telephone:  (646) 837-7150
Facsimile:  (212) 989-9163
Email: jarisohn@bursor.com
       pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Christopher R. Reilly*
701 Brickell Avenue, Suite 1420
Miami, FL 33131
Tel: (305) 330-5512
Fax: (305) 679-9006
E-Mail: creilly@bursor.com

*Pro Hac Vice Forthcoming*

*Attorneys for Plaintiffs*

**TABLE OF CONTENTS**

**PAGE(S)**

INTRODUCTION ................................................................................................................1

ARGUMENT ......................................................................................................................2

I.      PLAINTIFFS ARE CONSUMERS ...........................................................................2

      A.      Defendant's Newsletter is a Good or Service ...........................................3

      B.      Plaintiffs Are Subscribers .........................................................................9

II.     DEFENDANT DISCLOSED PLAINTIFFS' PERSONALLY IDENTIFIABLE INFORMATION ...................................................................................................11

III.    DEFENDANT DISCLOSED PLAINTIFFS' PERSONALLY IDENTIFIABLE INFORMATION TO FACEBOOK KNOWINGLY .......................................16

IV.    PLAINTIFFS HAVE ARTICLE III STANDING ..........................................18

CONCLUSION ................................................................................................................19

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*Austin-Spearman v. AMC Network Entertainment LLC*,
  98 F. Supp. 3d 662 (S.D.N.Y. 2015) ...............................................................6, 7, 9, 18

*Bernardino v. Barnes & Noble Booksellers, Inc.*,
  2017 WL 3727230 (S.D.N.Y. Aug. 11, 2017) .......................................................13

*Cane v. C.I.R.*,
  331 U.S. 1 (1947) .................................................................................................3

*Ciccone v. Cavalry Portfolio Services, LLC*,
  2021 WL 5591725 (E.D.N.Y. Nov. 29, 2021) .......................................................19

*Easlin v. The Coca-Cola Co.*,
  136 F. Supp. 3d 654 (E.D. Pa. 2015)....................................................................16

*Eichenberger v. ESPN, Inc.*,
  876 F.3d 979 (9th Cir. 2017) .....................................................................11, 12, 15

*El Omari v. Int'l Criminal Police Org.*,
  35 F.4th 83 (2d. Cir. 2022) ..................................................................................3

*Ellis v. Cartoon Network, Inc.*,
  803 F.3d 1251 (11th Cir. 2015) ....................................................................passim

*Ellis v. Cartoon Network, Inc.*,
  2014 WL 5023535 (N.D. Ga. Oct. 8, 2014) ...................................................11, 12

*In re Facebook, Inc., Consumer Privacy User Profile Litig.*,
  402 F. Supp. 3d 767 (N.D. Cal. 2019)....................................................................18

*In re Hulu Priv. Litig.*,
  86 F. Supp. 3d 1090 (N.D. Cal. 2015)...........................................................13, 16, 17

*In re Hulu Priv. Litig.*,
  2013 WL 6773794 (N.D. Cal. Dec. 20, 2013) .......................................................16

*In re Hulu Priv. Litig.*,
  2014 WL 1724344 (N.D. Cal. Apr. 28, 2014)........................................................11

*In re Nickelodeon Consumer Privacy Litigation*,
  827 F.3d 262 (3d Cir. 2016) ..................................................................................11

*Laurent v. PricewaterhouseCoopers LLP*,
  794 F.3d 272 (2d Cir. 2015) ..................................................................................8

*Loughrin v. United States*,
573 U.S. 351 (2014) ........................................................................................5

*McCrohan v. Sandulli Grace, P.C.*,
369 F. Supp. 3d 324 (D. Mass. 2019).............................................................18

*Michael Grecco Productions, Inc. v. Alamy, Inc.*,
372 F. Supp. 3d 131 (E.D.N.Y. 2019).............................................................18

*Panjiva, Inc. v. United States Customs and Border Protection*,
342 F. Supp. 3d 481 (S.D.N.Y. 2018) ..............................................................8

*Partshawk, LLC v. Tribridge Holdings, LLC*,
2019 WL 12517005 (M.D. Fla. Nov. 5, 2019) ..................................................8

*Perry v. Cable News Network, Inc.*,
854 F.3d 1336 (11th Cir. 2017) ......................................................................10

*Pratt v. KSE Sportsman Media, Inc. d/b/a Outdoor Sportsman Group, Inc.*,
2022 WL 469075 (E.D. Mich. Feb. 15, 2022) .............................................18, 19

*RAM v. Blum*,
533 F. Supp. 933 (S.D.N.Y. 1982) ..................................................................14

*Robinson v. Disney Online*,
152 F. Supp. 3d 176 (S.D.N.Y. 2015) .......................................................passim

*Senne v. Vill. of Palatine, Ill.*,
695 F.3d 597 (7th Cir. 2012) ...........................................................................16

*Simulados Software, Ltd. v. Photon Infotech Private, Ltd.*,
40 F. Supp. 3d 1191 (N.D. Cal. 2014)...............................................................4

*Sosa v. Alvarez-Machain*,
542 U.S. 692, 711 (2004) ..................................................................................5

*Sputz v. Alltran Financial, LP*,
2021 WL 5772033 (S.D.N.Y. Dec. 5, 2021) ....................................................19

*TransUnion LLC v. Ramirez*,
141 S. Ct. 2190 (2021) ..............................................................................18, 19

*U.S. ex rel. Milwaukee Soc. Democratic Pub. Co. v. Burleson*,
255 U.S. 407 (1921) ..........................................................................................5

*Ullmann v. Hedden*,
38 F. 95 (S.D.N.Y. 1889) ..................................................................................5

*United States Lines Co. v. Shaughnessy*,
101 F. Supp. 61 (S.D.N.Y. 1951) ......................................................................5

*United States v. Hastie*,
   854 F.3d 1298 (11th Cir. 2017) ........................................................................ 11, 15

*United States v. Shultz*,
   2018 WL 534333 (D. Kan. Jan. 24, 2018) .................................................................. 7

*Yershov v. Gannet Satellite Info. Network, Inc.*,
   204 F. Supp. 3d 353 (D. Mass. 2016) ....................................................................... 18

*Yershov v. Gannett Satellite Info. Network, Inc.*,
   820 F.3d 482 (1st Cir. 2016) ....................................................................... 1, 9, 11

*Zevon v. Am. Express Co.*,
   2021 WL 4330578 (S.D.N.Y. Sept. 22, 2021) ........................................................ 19

## STATUTES

18 U.S.C. § 2710 ........................................................................................................... 1

18 U.S.C. § 2710 (a)(1) ............................................................................................. 2, 8

18 U.S.C. § 2710(a)(3) ............................................................................................. 5, 11

18 U.S.C. § 2710(b)(1) ................................................................................................. 1

18 U.S.C. § 2710(b)(2) ............................................................................................... 19

D.C. Code Ann. § 28-3904(7) ...................................................................................... 4

## OTHER AUTHORITIES

S. Rep. 100-599 .................................................................................................... 1, 6, 8

## INTRODUCTION

> [A]s we continue to move ahead, we must protect time honored values that are so central to this society, particularly our right to privacy. The advent of the computer means not only that we can be more efficient than ever before, but that we have the ability to be more intrusive than ever before. Every day Americans are forced to provide to businesses and others personal information without having any control over where that information goes. Those records are a window into our loves, likes, and dislikes.

S. Rep. 100-599, at 7-8 (1988) (remarks by Senator Paul Simon). Much has changed since 1988, but Senator Simon's words continue to ring true. At its most basic level, Plaintiffs' complaint asks whether we continue to "protect time honored values that are central to this society, particularly our right to privacy."

When first enacted, the Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"), was the latest in "a long line of statutes passed by the Congress to extend privacy protection to records that contain information about individuals." S. Rep. No. 100-599, at 2. By passing the VPPA, Congress sought to "preserve personal privacy with respect to the rental, purchase or delivery of video tapes or similar audio visual materials." *Id.* at 1. To that end, Congress "created a civil remedy against a 'video tape service provider' for 'knowingly disclosing, to any person, personally identifiable information concerning any consumer of such provider.'" *Yershov v. Gannett Satellite Information Network, Inc.*, 820 F.3d 482, 485 (1st Cir. 2016) (quoting 18 U.S.C. § 2710(b)(1)). Defendant is one such "video tape service provider."

Defendant "operates hgtv.com, a website that hosts and delivers hundreds of videos featuring home and lifestyle content." (ECF No. 1) (the "Compl.") ¶ 2 (internal quotations omitted). Defendant incorporates the code for the Facebook Tracking Pixel on its website, which is "a piece of code that advertisers, like Defendant, can integrate into their website." *Id.* ¶ 12. "Once activated, the Facebook Tracking Pixel 'tracks the people and type of actions they take.'" *Id.* (quoting Facebook's documentation).

When a visitor navigates to hgtv.com, Defendant "transmits nine distinct events to Facebook." *Id.* ¶ 16.  The event data "permits an ordinary person to identify a video and the video's content." *Id.* ¶ 17.  Defendant also sends this data alongside cookies that contain an "unencrypted Facebook ID[,]" an "encrypted Facebook ID[,]" and a "browser identifier." *Id.* ¶¶ 24-26.  Defendant similarly uses "Advanced Matching," which "discloses a subscriber's email address whenever they input it into [a] form field." *Id.* ¶ 39.  Defendant thus "knowingly discloses information sufficiently permitting an ordinary person to identify a specific individual's video viewing behavior." *Id.* ¶¶ 45-48.  By doing so, Defendant violates the VPPA.

Defendant has no compelling defense.  *First*, Defendant's newsletter constitutes a good or service because it helps Defendant accumulate advertising revenue.  *See id.* ¶¶ 21, 38-43.  *Second*, Plaintiffs subscribes to this newsletter because they submitted their email address in exchange for access.  *See id.* ¶¶ 38-40.  *Third*, Defendant discloses personally identifiable information by transmitting users' email addresses, Facebook IDs, event data, and other identifiers.  *See id.* ¶¶ 16-50.  *Fourth*, by utilizing Facebook's code in the first place, Defendant disclosed this personally identifiable information knowingly.  *See id.* ¶ 86.  *Fifth*, Plaintiffs have Article III standing because Congress, through the VPPA, created a cognizable right to privacy that Defendant violated by disclosing Plaintiffs' personally identifiable information.

## ARGUMENT

## I. PLAINTIFFS ARE CONSUMERS

The VPPA defines "consumer" as "any renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710 (a)(1).  This definition can be reduced to the following three questions: Is Defendant a video tape service provider? Is Defendant's e-newsletter a good or service? And if so, did Plaintiffs rent, purchase, or subscribe to the e-newsletter?  Defendant only addresses the latter two questions, leaving undisputed that

Defendant is a video tape service provider.  For analytical clarity, Plaintiffs answer the second question before moving to the third.

### A.    Defendant's Newsletter is a Good or Service

Defendant begins by interpreting "goods or services" narrowly, arguing the phrase encompasses only "video material or a video service." *See* Memorandum of Law in Support of Defendant's Motion to Dismiss the Complaint (the "MTD") at 11.  But "goods or services" has an ordinary, everyday meaning, and that meaning includes more than video materials or services.

The VPPA lacks a definition for "goods or services," so those terms "should be interpreted where possible in their ordinary, everyday sense."  *Cane v. C.I.R.*, 331 U.S. 1, 6 (1947).  "To determine that ordinary meaning, courts may look to contemporary dictionary definitions."  *El Omari v. Int'l Criminal Police Org.*, 35 F.4th 83, 88 (2d. Cir. 2022); *see also* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 423 (2012) (identifying THE OXFORD ENGLISH DICTIONARY (2d ed.) as the preeminent dictionary in 1989, a year after the VPPA's passage).

The term "goods" means "[p]roperty or possessions; now in more restricted sense, movable property."  *See* THE OXFORD ENGLISH DICTIONARY (2d ed. 1989) (defining "good")[1]; *see also* THE OXFORD ENGLISH DICTIONARY (3d ed. 2014) (defining "good" as "economic assets which have a tangible, physical form (contrasted with *services*)").[2]  The term "services" represents the other side of the same coin, meaning "[t]he section of the economy that supplies needs of the consumer but produces no tangible goods."  *See id.* (defining "service").[3]  By combining these terms, the phrase "goods or services" covers all parts of society's economic

---

[1] Available at https://www.oed.com/oed2/00096762 (last accessed August 20, 2022).

[2] Available at https://www.oed.com/view/Entry/79925?rskey=6BZAtQ&result=1&isAdvanced=false#eid (last accessed August 20, 2022).

[3] Available at https://www.oed.com/oed2/00220776 (last accessed August 20, 2022).

output.  *Cf.* D.C. Code Ann. § 28-3904(7) (defining "goods and services" to mean "any and all parts of the economic output of society, at any stage or related or necessary point in the economic process").

To be sure, other statutes, like the Universal Commercial Code, parse between goods and services, forcing courts to grapple with whether internet-based products better fit either category. *See Simulados Software, Ltd. v. Photon Infotech Private, Ltd.*, 40 F. Supp. 3d 1191, 1199 (N.D. Cal. 2014) ("Applying the UCC to software poses a complex issue because transactions for software often combine elements of both goods and services.").  No such inquiry is needed here because the VPPA contemplates both.

Defendant's e-newsletter forms a part of society's economic output.  Defendant markets its newsletter as providing "the latest ideas, products and projects."  Compl. ¶ 38 (Figure 15). Before Plaintiffs could receive the newsletter, Defendant required them to "input an email address" and click "Sign Up."  *Id.* ¶ 38.  After Plaintiffs submitted their email address, Defendant "disclosed this identifier to Facebook, along with [their] Facebook ID and other identifying information, like identifiers for [their] browser."  *Id.* ¶¶ 38 (Figure 15), 53, 58, 63.  "The overwhelming amount of content featured in the newsletter links back to articles and videos on hgtv.com."  *Id.* ¶ 43.  Plaintiffs also "watched videos on hgtv.com[,]" *see id.* ¶¶ 52, 57, 62, but before each video, Defendant played an advertisement and tracked when Plaintiffs "start[ed] and finish[ed]" them.  *Id.* ¶ 21.  To synthesize: Defendant offered a periodical in exchange for contact information and contractual assent; Plaintiffs manifested assent by entering their email and clicking "Sign Up;" Defendant then turned that acceptance into profit by converting their contact information and activity into advertising revenue.  There is no question, therefore, that Defendant contributes to society's economic output by curating and distributing the newsletter.

Defendant's contrary interpretation lacks force.  To begin with, three canons of construction—the general-terms canon, the ordinary-meaning canon, and the presumption of consistent usage—undermine Defendant's position.  The general-terms canon stands for the proposition that "general terms are to be given their general meaning."  ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS, 101 (2012).  The ordinary-meaning canon dictates that, when terms are left undefined, "[w]ords of ordinary import receive their understood meaning, and technical terms are construed in their special sense." *United States Lines Co. v. Shaughnessy*, 101 F. Supp. 61, 64 (S.D.N.Y. 1951).  The presumption of consistent usage counsels that, "when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n. 9 (2004) (internal quotations omitted).

Here, it cannot be disputed that "goods or services" is a general phrase that ordinarily embraces more than just video services or materials.  *See, e.g.*, *Ullmann v. Hedden*, 38 F. 95, 96 (S.D.N.Y. 1889) (describing a "plain canvas" as "goods"); *U.S. ex rel. Milwaukee Soc. Democratic Pub. Co. v. Burleson*, 255 U.S. 407, 433, n.16 (1921) (describing "first-class mail" as a "service").  Thus, under the general-terms and ordinary-meaning canons, that phrase should be construed generally and ordinarily, not technically.  The third canon, the presumption of consistent usage, reinforces this conclusion.  Defendant interprets "goods or services" to mean "video material or a video service," but Congress used nearly identical language—"specific video materials or services"—when defining "personally identifiable information."  *See* 18 U.S.C. § 2710(a)(3).  Under the presumption of consistent usage, "different language signals different meanings," *see Loughrin v. United States*, 573 U.S. 351, 351 (2014), and so "goods or services" must mean something different than "specific video materials or services."  Defendant

5

advances no reason for why Congress would utilize different phrases for the same meaning within the same statute. Without such reasoning, the ordinary and general meaning must control.

Defendant then references the legislative history, but that extrinsic evidence favors the ordinary, plain meaning. In particular, the Senate Report reinforces the presumption of consistent usage, confirming that "[t]he definition of personally identifiable information includes the term 'video' to make clear that simply because a business is engaged in the sale or rental of video materials or services does not mean that all of its products or services are within the scope of the bill." S. Rep. 100-599, 1988 WL 243503, at *12. The Senate Report also evinces an intent to cover a variety of entities, from "golf shop[s]" to "department store[s]" to "continuity club[s]." *Id.* at *12-13. The legislative history, therefore, offers Defendant no refuge.

Defendant's cited case authority fares no better. Defendant begins by relying on *Austin-Spearman v. AMC Network Entertainment LLC*, 98 F. Supp. 3d 662, 669 (S.D.N.Y. 2015), stating that case supports its interpretation. MTD at 11. Far from it. In *Austin-Spearman*, the plaintiff declined to allege any relationship with the video tape service provider, AMC Networks, and instead relied exclusively on her relationship with the recipient, Facebook, alleging she "ha[d] been a member of Facebook since 2007 and remain[ed] logged in through her website." *Austin-Spearman*, 98 F. Supp. 3d at 664. Here, however, Plaintiffs rely on their relationship with Defendant, not Facebook, rendering the analysis in *Austin-Spearman* irrelevant. *See, e.g.*, Compl. ¶ 83 (alleging "Plaintiffs and members of the Class are 'consumers' because they subscribed to HGTV's newsletter.").

Defendant tacitly recognizes this distinction and pivots to dicta, pulling from a discussion in *Austin-Spearman* about whether to grant leave to amend. There, after briefing and oral argument, the plaintiff disclosed that she "registered for AMC's newsletter as it relates to the Walking Dead TV Show[.]" *Austin-Spearman*, 98 F. Supp. 3d at 671 (internal quotations

omitted).  The court reluctantly granted leave to amend, describing the newsletter as "non-video-related"[4] and "distinct and set apart from its provision of videos[.]"  *Id.*  To the extent this commentary holds any persuasive value, it is nevertheless irrelevant to the present case because Plaintiffs allege that Defendant's newsletter features videos that link back to Defendant's website.  *See* Compl. ¶ 43 ("The overwhelming amount of content featured in the newsletter links back to articles and videos on hgtv.com.").[5]  That is enough to distinguish the dicta in *Austin-Spearman*.

Defendant also analogizes to *United States v. Shultz*, 2018 WL 534333 (D. Kan. Jan. 24, 2018), but that case merely reinforces the presumption of consistent usage.  *See* MTD at 12.  In *Shultz*, the court examined the definition of "personally identifiable information," particularly whether "the term 'services' in the phrase 'specific video materials or services' is completely divorced from and not modified by 'video' or 'specific video.'"  *Shultz*, 2018 WL 534333, at *3. The court concluded that "the term 'specific video' in the definition of PII modifies not only the word 'material,' but also the word 'services.'"  *Id.* at *4.  Unlike the definition of "personally identifiable information," however, the definition of "consumer" contains no such "specific video" limitation.  By omitting this modifier, Congress intended the phrase "goods or services" to be construed broadly and without reference to the underlying video materials.

Defendant then suggests that the newsletter only constitutes reading materials, and that

---

[4] Understanding that even its reliance on dicta is misplaced, Defendant then reaches back into the docket, citing to the letter that the plaintiffs submitted to the court.  MTD at 11.  That letter attaches a screenshot of the *Walking Dead* newsletter as an exhibit, but the plaintiff only offered that newsletter to support the notion that she provided AMC Networks with an email address. Thus, even if the newsletter featured videos, there is no basis to conclude that the court considered those videos in its opinion, dicta or otherwise.

[5] Defendant also seems to suggest that Plaintiffs must have alleged "that they viewed content in the Newsletter or that Scripps disclosed requests to view or obtain such content within it."  MTD at 11.  But that is contrary to caselaw on the issue.  *See Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1257 (11th Cir. 2015) ("[T]he Washington video store could have violated the VPPA, even if Judge Bork forgot his video store rental card, had it been able to physically identify him as the person who rented a particular movie and then given that information to a third party.").

reading materials are outside the VPPA's scope.  MTD at 13-14 (citing the legislative histoy and state analogues).  But Plaintiffs make no attempt to cover reading materials.  Rather, Plaintiffs allege Defendant discloses information that "independently and jointly permits an ordinary person to identify a video and the video's content."  Compl. ¶¶ 17, 23. (emphasis added).  And although the newsletter may contain some reading materials, the legislative history establishes that Defendant still has an obligation to safeguard data relating to the video materials.  *See* S. Rep. 100-599, 1988 WL 243503, at *12 ("[A] department store that sells video tapes would be required to extend privacy protection to only those transactions involving the purchase of video tapes and not other products.").

Defendant ends by arguing that, even if the phrase "goods or services" covers more than "video materials or services," the newsletter "is likely neither a good nor service under the VPPA, because it is not tangible chattel or labor."  MTD at 15.  Antecedently, Defendant implies that the newsletter cannot be a combination of both goods and services, yet that implication, as previously mentioned, runs counter to the VPPA's text.  *See* 18 U.S.C. § 2710 (a)(1); *see also Laurent v. PricewaterhouseCoopers LLP*, 794 F.3d 272, 282 (2d Cir. 2015) (observing that "[w]ords in a statutory text should not be interpreted in isolation") (internal quotations omitted); *Partshawk, LLC v. Tribridge Holdings, LLC*, 2019 WL 12517005, at *8-9 (M.D. Fla. Nov. 5, 2019) (finding that a contract for "a computer software package" was "predominantly for services, with goods only incidentally involved").  Moreover, Defendant seemingly concedes that, if Plaintiffs paid for the e-newsletter, then it would constitute a good or service, but as discussed later in greater detail, *see* Section I.B, *infra*, "payment is not a necessary element of a subscription."  *See Ellis*, 803 F.3d at 1256.  Whether the newsletter constitutes "goods or services," therefore, cannot hinge on whether a monetary exchange is required, otherwise that would render the term "subscriber" superfluous.  *See Panjiva, Inc. v. United States Customs and*

*Border Protection*, 342 F. Supp. 3d 481, 490 (S.D.N.Y. 2018) (stating that, under the rule against superfluity, "courts must give effect to all of a statute's provisions so that no part will be inoperative or superfluous, void or insignificant") (internal quotations omitted).

**B.   Plaintiffs Are Subscribers**

Defendant acknowledges that Plaintiffs "enter[ed] their email addresses to receive the Newsletter[,]" but nonetheless contends that they cannot constitute subscribers because "[t]here is no ongoing commitment to receive the Newsletter, and certainly no ongoing commitment to subscribe to video services."  MTD at 14.  That argument contradicts well-established caselaw.

"'[S]ubscription' involves some type of commitment, relationship, or association (financial or otherwise) between a person and an entity."  *Ellis*, 803 F.3d at 1256 (emphasis added); *see also Yershov*, 820 F.3d at 487 (defining "subscription" as "'[a]n agreement to receive or be given access to electronic texts or services'") (quoting THE AMERICAN HERITAGE DICTIONARY 1726 (4th Ed. 2000)).   "[P]ayment is not a necessary element of subscription." *Ellis*, 803 F.3d at 1256.  Indeed, "there are numerous periodicals, *newsletters*, blogs, videos and other services that a user can sign up for (i.e. subscribe to) and receive for free."  *Id.* (emphasis added).  As one court reasoned:

> Whatever the nature of the specific exchange, what remains is the subscriber's deliberate and durable affiliation with the provider: whether or not for payment, these arrangements necessarily require some sort of ongoing relationship between provider and subscriber, one generally undertaken in advance and by affirmative action on the part of the subscriber, so as to supply the provider with sufficient personal information to establish the relationship and exchange.

*Austin-Spearman*, 98 F. Supp. 3d at 669; *see also Ellis*, 803 F.3d at 1258 ("[W]e generally agree with the approach and result of *Austin-Spearman*[.]").

As previously established, Defendant's newsletter constitutes a good or service.  *See* Section I.A., *supra*.  As the name denotes, Defendant sends this newsletter on a recurrent basis, featuring "the latest ideas, products and projects."  Compl. ¶ 38 (Figure 15).  Plaintiffs

subscribed to that newsletter by exchanging their email addresses. *See id.* ¶ 38.  Unbeknownst to Plaintiffs, Defendant "discloses a subscriber's email address whenever they input it into the form field." *See id.* ¶ 39.  By submitting their email addresses in exchange for receiving the newsletter, Plaintiffs subscribed to Defendant's goods or services. *See id.* ¶ 38 (Figure 15) (requiring users to click "Sign Up"); *id.* ¶ 42 (Figure 16) (declaring "You're subscribed!").

Defendant offers no meaningful counter.  Defendant first cites to *Ellis*, contending that Plaintiffs "have not alleged an 'ongoing commitment or relationship' with Scripps."  MTD at 14.  But a free newsletter is precisely the "ongoing commitment" that the court in *Ellis* contemplated.  *See Ellis*, 803 F.3d at 1256 (mentioning "newsletters … that a user can sign up for (i.e. subscribe to) and receive for free.").  Defendant also cites to *Perry*, but that case adds nothing to the analysis, merely reaffirming that "*Ellis* controls" and Plaintiffs must "demonstrate[] an ongoing commitment or relationship with [Defendant]."  *See Perry v. Cable News Network, Inc.*, 854 F.3d 1336, 1342 (11th Cir. 2017).  Defendant again shifts to dicta, pointing to language in *Perry* that discusses the plaintiff's attempt to amend the complaint to add allegations about "his relationship with his cable television provider[.]"  *Id.*  But just as with *Austin-Spearman*, that dictum is distinguishable because the amendment only sought to establish a relationship with a separate third-party, not the video tape service provider.  *Id.* (relying on "his status as a subscriber of his cable television provider[,]" not as a subscriber of the video tape service provider).  Here, by contrast, Plaintiffs allege "they subscribed to HGTV's newsletter."  Compl. ¶ 83.  Thus, because this establishes an ongoing commitment and relationship with Defendant, Plaintiffs are subscribers and therefore consumers.

## II.   DEFENDANT DISCLOSED PLAINTIFFS' PERSONALLY IDENTIFIABLE INFORMATION

Defendant argues that "Plaintiffs have not adequately alleged that Scripps disclosed PII." MTD at 16.  That argument, however, misconstrues Plaintiffs' complaint.

The VPPA defines "personally identifiable information" as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."  18 U.S.C. § 2710(a)(3).  Circuits have interpreted this definition differently. *Compare In re Nickelodeon Consumer Privacy Litigation*, 827 F.3d 262, 267 (3d Cir. 2016) (defining PII as "information that would readily permit an ordinary person to identify a specific individual's video-watching behavior") *with Yershov,* 820 F.3d at 486 (defining PII as "information reasonably and foreseeably likely to reveal which ...videos [plaintiff] has obtained").

Although the Second Circuit has yet to articulate its own interpretation, one court in this District has defined personally identifiable information as "information which identifies a particular person as having accessed specific video materials."  *See Robinson v. Disney Online*, 152 F. Supp. 3d 176, 182 (S.D.N.Y. 2015).

Email addresses and Facebook IDs identify particular people.  *See id.* at 184 ("A Facebook ID, as the *Hulu* court found, is … equivalent to a name—it stands in for a specific person, unlike a device identifier."); *Ellis v. Cartoon Network, Inc.*, 2014 WL 5023535, at *3 (N.D. Ga. Oct. 8, 2014) ("[D]isclosure of a Facebook ID, which can identify a specific person without any additional steps, does qualify as personally identifiable information."); *In re Hulu Priv. Litig.*, 2014 WL 1724344, at *14 (N.D. Cal. Apr. 28, 2014) ("The Facebook User ID …. personally identifies a Facebook user."); *see also United States v. Hastie*, 854 F.3d 1298, 1303 (11th Cir. 2017) ("Email addresses fall within the ordinary meaning of 'information that identifies an individual.'"); *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 986 (9th Cir. 2017) ("A

11

Facebook link or an email address may very well readily enable an 'ordinary person' to identify an individual.").

Plaintiffs plausibly allege that Defendant disclosed their personally identifiable information. Plaintiffs allege that they "enrolled in Defendant's newsletter." Compl. ¶¶ 52, 57, 62. When Plaintiffs submitted their email addresses, Defendant "disclosed this identifier to Facebook, along with [their] Facebook ID and other identifying information, like identifiers for [their] browser." *Id.* ¶¶ 54, 58, 62. Plaintiffs also "watched videos on hgtv.com." *Id.* After doing so, "Defendant disclosed event data to Facebook, knowing Facebook would combine that data with the identifiers." *Id.* ¶¶ 54, 59, 64. This event data "recorded and disclosed the video's title and content, along with every time [Plaintiffs] paused a video, played a video, started a video, or completed a video." *Id.* ¶¶ 52, 57, 62. These allegations demonstrate that Defendant "disclosed to a third party, Facebook, Plaintiffs' and the Class members' personally identifiable information." *Id.* ¶ 83.

Defendant has no persuasive rebuttal. Defendant begins by arguing that "Plaintiffs have not adequately alleged that any Facebook IDs would enable an ordinary person to identify an individual as having watched specific videos[.]" MTD at 16. Plaintiffs plead, however, that "[a]nyone can identify a Facebook profile—and all personal information publicly listed on that profile—by appending the Facebook ID to the end of Facebook ID." Compl. ¶ 33. Moreover, as previously set forth, courts in the Second Circuit, Ninth Circuit, and Eleventh Circuit all disagree with Defendant's position. *See, e.g.*, *Robinson*, 152 F. Supp. 3d at 184 (observing a Facebook ID, by itself, identifies a person); *Eichenberger*, 876 F.3d at 986 (same); *Ellis*, 2014 WL 5023535, at *3 (same). Defendant's first argument, therefore, can be swiftly defeated.

Defendant's second argument should meet the same fate. Although conceding that it disclosed a Facebook ID, Defendant draws issue with the complaint's purported failure to allege

whether this identifier was encrypted or unencrypted, arguing the latter "would not be decipherable by an ordinary person, because only those with the encryption key could unencrypt it." MTD at 17. Encrypted or unencrypted, however, a Facebook ID constitutes personally identifiable information. *See In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090, 1097 (N.D. Cal. 2015) ("No one would deny that I would violate the VPPA by passing someone an encrypted list of Judge Bork's video rentals—if my recipient and I both understood that we would use a mutually intelligible code."); *see also Robinson*, 152 F. Supp. 3d at 182-83 ("Disney could not disclose the information at issue here, along with a code that enabled Adobe to decrypt the hashed serial number and other information necessary to determine the specific device's user, and still evade liability.").

For support, Defendant relies on *Bernardino v. Barnes & Noble Booksellers, Inc.*, 2017 WL 3727230 (S.D.N.Y. Aug. 11, 2017), but that case says no differently. There, the plaintiff sought a preliminary injunction, and to succeed on that motion, she had to prove "a clear and substantial showing of success on the merits and a strong showing of irreparable harm." *Id.* at *5. Although the court held that "Bernardino has not made a clear and substantial showing of success on the merits[,]" the court expressly recognized that "[the] task on the present motion is not to decide the issue of whether the information conveyed is PII." *Id.* *9. Thus, *Bernardino* is unavailing, and the Court should instead follow the reasoning in *Robinson* and *In re Hulu*.

Defendant similarly contends that "Plaintiffs do not explain how encrypted Facebook IDs … enable an ordinary person to identify a specific HGTV.com visitor." MTD at 17. To "encrypt" information means to "convert (data, a message, etc.) into cipher or code, esp. in order to prevent unauthorized access; to conceal *in* something by this means." OXFORD ENGLISH

DICTIONARY (3d ed 2014) (defining "encrypt").[6]  Defendant "compel[s] the browser" to transmit

the encrypted Facebook ID to Facebook.  *See id.* ¶ 25.  In other words, Facebook is the intended

recipient, and as such, Facebook can read an encrypted value just as plainly as an unencrypted

value.  *See* MTD at 18 ("[T]hese IDs … are encrypted by Facebook.").  Consequently, from

Facebook's perspective—and that of an ordinary person—an encrypted Facebook ID is the exact

same as an unencrypted Facebook ID.  The VPPA must reach encrypted disclosures, otherwise it

"would lead to a result that conflicts with common sense and that is unreasonable in light of the

evident statutory purpose."  *See RAM v. Blum*, 533 F. Supp. 933, 949 (S.D.N.Y. 1982).  If the

VPPA failed to reach encrypted disclosures, an executive at Netflix, for example, could disclose

the next Supreme Court nominee's personally identifiable information to a Washington Post

reporter, but so long as that executive disclosed the information over WhatsApp, the VPPA

would have no applicability.  It would, to put bluntly, render the VPPA a nullity.  *See Robinson*,

152 F. Supp. 3d at 179 (describing the VPPA's impetus as "the publication in 'a weekly

newspaper in Washington' of a 'profile of Judge Robert H. Bork based on the titles of 146 files

his family had rented from the video store'") (quoting Sen. Rep. 100-599, at 5 (1988)).

Accordingly, that construction should be rejected.[7]

Defendant then asserts that "the sources Plaintiffs cite in their Complaint do not explain

how browser identifiers could identify them."  MTD at 19.  To the contrary, the complaint details

the ways in which the _fbp cookie can overlap with the fr cookie.  *See* Compl. ¶¶ 30-31.  If the fr

---

[6] Available at
https://www.oed.com/view/Entry/242721?redirectedFrom=encrypted#eid12621796.

[7] Defendant repeats this argument with respect to email addresses, asserting that "[e]ven if
recipients could somehow match hashed email addresses with other data, that would not mean
that Scripps disclosed PII under the VPPA."  MTD at 20.  To "hash" information means to
utilize a function "whose output values are all the same number of bits in length; *esp.* one used to
encrypt or compress data, or to generate indices when organizing or storing data in a computer."
OXFORD ENGLISH DICTIONARY (3d. 2014) (defining "hash function"), *available at*
oed.com/view/Entry/84445?rskey=49E6ig&result=1&isAdvanced=false#eid.  The analysis with
respect to encrypted Facebook IDs is the same as that for hashed email addresses.

and _fbp cookies are transmitted at the same time, for example, then the _fbp cookie, which contains a browser identifier, can still be associated with the fr cookie, which contains a Facebook ID, even after the fr cookie expires.[8]  Put differently, once a Facebook ID is associated with a particular browser identifier, that transforms the browser identifier into information "which itself identifies a particular person[.]"  *See Robinson*, 152 F. Supp. 3d at 182.

Defendant ends by contending that "Plaintiffs have not adequately alleged that Scripps disclosed PII by transmitting email addresses to Facebook through the use of Advanced Matching."  MTD at 19.  To support this contention, Defendant first reasons that "Plaintiffs have not alleged that the email addresses they used to sign up for the Newsletter contained their names or otherwise identified them."  MTD at 20.  But an email address, by itself, is information that identifies a particular person.  *See Hastie*, 854 F.3d at 1303 ("Email addresses fall within the ordinary meaning of 'information that identifies an individual.'"); *Eichenberger*, 876 F.3d at 986 (9th Cir. 2017) ("A Facebook link or an email address may very well readily enable an 'ordinary person' to identify an individual.").  Defendant alternatively reasons that, even if independently identifying, Plaintiffs "have failed to plead that they watched videos close in time to when they input their email addresses to sign up for the Newsletter."  MTD at 20.  But as the Eleventh Circuit has recognized, such a temporal limitation lacks sense because "the Washington video store could have violated the VPPA, even if Judge Bork forgot his video store rental card, had it been able to physically identify him as the person who rented a particular movie and then given that information to a third party."  *Ellis*, 803 F.3d at 1257.  Here, Plaintiffs allege that, when they entered their email addresses, Defendant "disclosed this identifier to Facebook, along with [their] Facebook ID and other identifying information, like identifiers for [their] browser."  Compl. ¶¶

---

[8] Although both expire after 90 days, that time can be reset based on triggering events that differ between the fr and _fbp cookie.  *Compare* Compl. ¶ 29 *with id.* ¶ 30.

53, 58, 63.  Then, "[w]hen [Plaintiffs] watched videos on hgtv.com, Defendant disclosed event

data to Facebook, knowing Facebook would combine that data with the identifiers."  *Id.* ¶¶ 54,

59, 54.  By doing so, Defendant disclosed Plaintiffs personally identifiable information.  *Id.* ¶¶

55, 60, 65.  Defendant cannot overcome these well-pled allegations.

## III.   DEFENDANT DISCLOSED PLAINTIFFS' PERSONALLY IDENTIFIABLE INFORMATION TO FACEBOOK KNOWINGLY

Defendant argues that Plaintiffs have failed to allege "a *knowing* disclosure."  MTD at 21

(emphasis in the original).  Defendant ignores the 89 paragraphs in the complaint that

unmistakably demonstrate Defendant disclosed Plaintiffs' personally identifiable information

knowingly.

A defendant discloses personally identifiable information knowingly when it possesses

"consciousness of transmitting the private information." *In re Hulu Priv. Litig.*, 86 F. Supp. 3d

1090, 1095 (N.D. Cal. 2015). This approach is "consistent with cases that have explained the

knowledge requirement under the Electronic Communications Privacy Act of 1986, on which the

VPPA was modeled." *Id.*  It does not matter whether the defendant possesses "knowledge of

illegality or potential consequences," *see Senne v. Vill. of Palatine, Ill.*, 695 F.3d 597, 603 (7th

Cir. 2012), nor does it matter whether "third parties actually see the disclosed information to

constitute a violation." *Easlin v. The Coca-Cola Co.*, 136 F. Supp. 3d 654, 671 (E.D. Pa. 2015);

*see also In re Hulu Priv. Litig.*, 2013 WL 6773794, at *7 (N.D. Cal. Dec. 20, 2013) ("Again, the

DPPA's plain language is so similar to the VPPA as to be practically indistinguishable.").

Plaintiffs plausibly plead that Defendant disclosed their personally identifiable

information knowingly.  Defendant "knowingly disclosed Plaintiffs' PII because it used that data

to build audiences on Facebook and retarget them for its advertising campaigns."  Compl. ¶ 86.

To build the audiences, Defendant "integrate[d]" and "activated" the Facebook Tracking Pixel.

*Id.* ¶ 12.  Defendant, like all other advertisers, "control[led] how the Facebook Tracking Pixel

identifie[d] visitors." *Id.* ¶ 14.  Defendant also controlled the event data collected, "including the website's metadata, along with what pages a visitor views and what buttons a visitor clicks." *Id.* ¶ 13.  These allegations fully support the notion that Defendant "knowingly transmitt[ed] Plaintiffs' and the putative class's personally identifiable information to unrelated third persons." *Id.* ¶ 5.  Thus, by integrating and configuring the Facebook Tracking Pixel, Defendant possessed "consciousness of transmitting the private information."  *See In re Hulu*, 86 F. Supp. 3d at 1095.

Defendant has no credible response.  Defendant analogizes to *In re Hulu*, stating that "Plaintiffs here do not sufficiently allege that Scripps ever knew that event data and identifiers were transmitted such that Facebook 'combine those discrete things to reconstruct PII.'"  MTD at 22 (*In re Hulu Priv. Litig.*, 86 F. Supp. 3d at 1098).  That reliance, however, is misplaced.  *In re Hulu*, which decided a second summary judgment motion, involved the Facebook "Like" button.  *See In re Hulu Priv. Litig.*, 86 F. Supp. 3d at 1093.  This case, however, concerns the Facebook Tracking Pixel, which is built to track web activity and associate it with a Facebook profile.  *See, e.g.*, Compl. ¶¶ 11-12 (describing how advertisers, like Defendant, integrate the Facebook Tracking Pixel so they can build "Custom Audiences" and "Lookalike Audiences," both of which "require an advertiser to supply the underlying data to Facebook"); *id.* ¶¶ 13, 16 (explaining how "[a]dvertisers control what actions—or, as Facebook calls it, 'events'—the Facebook Tracking Pixel will collect," and how Defendant "transmits nine distinct events to Facebook"); *id.* (stating that advertisers, like Defendant, can choose from "a menu of 'standard events,'" and showing that Defendant selected "PageView," "VideoContentComplete," and "VideoAdComplete"); *id.* ¶¶ 13, 41(describing how "[a]n advertiser can also create their own tracking parameters by building a 'custom event,'" and revealing that Defendant transmits "Custom Parameters" through "Button Click").

Notwithstanding this, should any skepticism remain, courts relax the pleading requirements "where information is in a defendant's sole possession." *McCrohan v. Sandulli Grace, P.C.*, 369 F. Supp. 3d 324, 335 (D. Mass. 2019) (internal quotations omitted).  Indeed, "the Second Circuit requires district courts to be lenient in allowing scienter issues to survive motions to dismiss because such issues are appropriate for resolution by the trier of fact." *Michael Grecco Productions, Inc. v. Alamy, Inc.*, 372 F. Supp. 3d 131, 139 (E.D.N.Y. 2019).  At a minimum, therefore, Plaintiffs' allegations are sufficient to move beyond the pleading stage and into discovery.

## IV.   PLAINTIFFS HAVE ARTICLE III STANDING

Defendant also argues that Plaintiffs lack Article III standing.  *See* MTD at 23-25.  But federal courts in this District and across the country are in accord that a sufficiently alleged violation of the VPPA confers Article III standing.  *See, e.g.*, *Austin-Spearman*, 98 F. Supp. 3d at 666-67 ("[T]he VPPA creates a right to the privacy of one's video-watching history, the deprivation of which – through wrongful disclosure, or statutory violation alone – constitutes an injury sufficient to confer Article III standing.") (citing other decisions in accord);  *Yershov v. Gannet Satellite Info. Network, Inc.,*, 204 F. Supp. 3d at 359-62 (D. Mass. 2016) (same); *In re Facebook, Inc., Consumer Privacy User Profile Litig.*, 402 F. Supp. 3d 767, 784-787 (N.D. Cal. 2019) (same).

Implicitly recognizing the mountain of case law against its position, Defendant argues that the Supreme Court's holding in *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) somehow changes the analysis.  *See* MTD at 23-24.  But *TransUnion* confirms that Plaintiffs have Article III standing to pursue this case.  A federal court recently addressed this argument in *Pratt v. KSE Sportsman Media, Inc. d/b/a Outdoor Sportsman Group, Inc.*, -- F. Supp. 3d --, 2022 WL 469075 (E.D. Mich. Feb. 15, 2022), a case brought pursuant to Michigan's state analog

to the VPPA.  As Judge Ludington explained:

> In *TransUnion*, the Supreme Court considered whether two groups
> of class members bringing claims under the Fair Credit Reporting
> Act suffered a concrete injury in fact under Article III.  The first
> group of class members had a misleading credit report
> "disseminated to third parties."  The second group merely had a
> misleading remark on their credit files that was not disseminated to
> a third party.  The *TransUnion* Court held that the first group
> suffered a concrete injury in fact under Article III.
>
> Likewise, Plaintiffs allege that their "Private Reading Information"
> was disclosed to third parties without their consent.  In this way,
> *TransUnion* reinforces that Plaintiffs' [Michigan VPPA] claims
> have Article III standing.

*Id.* at *9.  The same analysis applies here.[9]

To be sure, Defendant attempts to recast Plaintiffs' allegations to be only "that the
disclosure in the Privacy Notice of HGTV.com does not meet the requirements of a 'distinct and
separate' consent set forth in 18 U.S.C. § 2710(b)(2)," but that is incorrect.  MTD at 24.  The
complaint plainly alleges that Defendant violated the VPPA by "disclos[ing] to a third party,
Facebook, Plaintiffs' and the Class members' personally identifiable information" through
utilization of the Facebook Tracking Pixel.  *See, e.g.*, Compl. ¶ 84.  That Defendant did not
obtain the requisite consent confirms that Defendant violated the VPPA, but does not take away
from the central allegation that Defendant allegedly disclosed Plaintiffs' PII in violation of the
VPPA.  Simply put, Plaintiffs have Article III standing.

## CONCLUSION

For the foregoing reasons, Defendant's Motion should be denied in full.

---

[9] The cases cited by Defendant do not concern the VPPA and do not compel a different
conclusion.  *See Ciccone v. Cavalry Portfolio Services, LLC*, 2021 WL 5591725 (E.D.N.Y. Nov.
29, 2021) (no standing where plaintiffs alleged defendant-debt collector utilized a third party to
send debt collection notices in violation of the Fair Debt Collection Practices Act); *Sputz v.
Alltran Financial, LP*, 2021 WL 5772033 (S.D.N.Y. Dec. 5, 2021) (same); *Zevon v. Am. Express
Co.*, 2021 WL 4330578 (S.D.N.Y. Sept. 22, 2021) (no standing where plaintiff alleged that
defendant failed to provide both a phone number and address for billing inquires on credit card
statements in violation of the Truth In Lending Act).

Dated: August 30, 2022                     Respectfully submitted,

                                           **BURSOR & FISHER, P.A.**

                                           By:_____*/s/ Joshua D. Arisohn*_____
                                                       Joshua D. Arisohn

                                           Joshua D. Arisohn
                                           Philip L. Fraietta
                                           888 Seventh Avenue
                                           New York, NY 10019
                                           Telephone:  (646) 837-7150
                                           Facsimile:  (212) 989-9163
                                           Email: jarisohn@bursor.com
                                                    pfraietta@bursor.com

                                           **BURSOR & FISHER, P.A.**
                                           Christopher R. Reilly*
                                           701 Brickell Avenue, Suite 1420
                                           Miami, FL 33131
                                           Tel: (305) 330-5512
                                           Fax: (305) 679-9006
                                           E-Mail: creilly@bursor.com

                                           *Pro Hac Vice Forthcoming*

                                           *Attorneys for Plaintiffs*